UNITED STATES, to Use of THOMAS LAUGHLIN CO., v. MORGAN et al.

(Circuit Court, D. Maine. September 15, 1900.)

No. 30.

1. CONTRACTS FOR GOVERNMENT WORK—BONDS OF CONTRACTOR—CLAIMS SE-CURED.

The surety in a bond given by a contractor for government work, conditioned as required by Act Aug. 13, 1894 (28 Stat. 278), to secure the payment of all persons supplying the contractor "labor and materials in the prosecution of the work," is liable, in favor of one supplying materials, for the price of materials so furnished which actually entered into the work, together with the expense of transporting the same to the place where the work was being done, paid by the claimant, which may properly be considered as a part of the price; also for materials used in the construction of false works· necessary in the performance of the contract; but he is not liable for repairs or equipment furnished for a steam launch owned and used by the contractor to transport supplies, nor for materials for the construction of dump cars, tracks, derricks, storage sheds for materials, or other similar structures or appliances used by the contractor, or tools for use by the workmen.

2. PAYMENTS—APPLICATION AS BETWEEN CREDITOR AND SURETY.

Where plaintiff supplied materials to a contractor for government work, for a part of which he was protected by the contractor's bond, and for part of which he was not, as between him and the surety on such bond payments made on account generally by the contractor should be applied to the payment· for materials furnished and charged prior to the dates of such payments.

At Law.

Benjamin Thompson, for plaintiff.

Anthoine & Talbot, for defendant American Surety Co.

WEBB, District Judge. This is an action of debt on a bond executed by the defendant Morgan as principal and the American Surety Company of New York as surety for the performance of a contract by Morgan to supply materials and do work on fortifications to be constructed by the United States on Diamond Island, near Portland, Me. Trial by jury is waived, and the cause is submitted to the court; the right of exception to rulings of the court on questions of law during the trial, and in its conclusions upon the facts, being reserved.

Upon the hearing the court finds the following facts:

(1) The contract between Morgan and the United States is as follows:

Proposals for Building Gun Emplacements and Wharf on Great Diamond. Island, Portland Harbor, Maine.

U. S. Engineer Office, 537 Congress Street.

Portland, Maine, January 21, 1897.

Sealed proposals for building gun emplacements and wharf on Great Diamond Island, Portland Harbor, Maine, will be received until 3 p. m. February 18, 1897, and then publicly opened. For information, apply to

A. N. Damrell, Lieut. Col. of Engineers.

Specifications.

General Instructions for Bidders.

1. The attention of bidders is specially invited to the acts of congress approved February 26, 1885, and February 23, 1887, as printed in vol. 23, page

332, and vol. 24, page 414, United States Statutes at Large, which prohibit the importation of foreigners and aliens, under contract or agreement, to perform labor in the United States or territories or the District of Columbia.

2. "That all material purchased under the foregoing provisions of this act shall be of American manufacture, except in cases when, in the judgment of the secretary of war, it is to the manifest interest of the United States to make purchases in limited quantities abroad, which material shall be admitted free of duty." (Extract from fortification appropriation act, approved June 6, 1896.)

3. Maps of the localities may be seen at this office. Bidders, or their authorized agents, are expected to visit the place, and to make their own estimates of the facilities and difficulties attending the execution of the work, including the uncertainty of weather and all other contingencies.

4. No proposal will be considered unless accompanied by a guaranty in manner and form as directed in these instructions.

5. All bids and guaranties must be made in triplicate, upon printed forms to be obtained at this office.

6. The guaranty attached to each copy of the bid must be signed by two responsible guarantors, to be certified as good and sufficient guarantors by a judge or clerk of United States court, United States district attorney, United States commissioner, or judge or clerk of a state court of record, with the seal of said court attached.

7. A firm, as such, will not be accepted as surety, nor a partner for a copartner or firm of which he is a member. Stockholders who are not officers of a corporation may be accepted as sureties for such corporation. Sureties must be citizens of the United States.

8. Each signature to guaranties and bonds shall have affixed to it an adhesive seal. All signatures to proposals, guaranties, contracts, and bonds should be written out in full, and each signature to guaranties, contracts, and bonds should be attested by at least one witness, and when practicable by a separate witness to each signature.

9. Each guarantor must justify in the sum of fifteen thousand dollars on bids for the emplacements, and three thousand dollars on bids for the wharf. The liability of the guarantors and bidder is determined by the act of March 3, 1883 (22 Statutes, 487, chap. 120), and is expressed in the guaranty attached to the bid.

10. A proposal by a person who affixes to his signature the word "President," "Secretary," "Agent," or other designation, without disclosing his principal, is the proposal of the individual. That by a corporation must be signed with the name of the corporation, followed by the signature of the president, secretary, or other person authorized to bind it in the matter, who must file evidence of his authority to do so. That by a firm must be signed with the firm name, by a member thereof, or by its agent, giving the names of all members of the firm. Note, also, par. 16, infra.

11. The place of residence of every bidder, and post-office address, with county and state, must be given after his signature.

12. All prices must be written, as well as expressed in figures.

13. One copy each of the advertisement, the instructions for bidders, and the specifications, all of which can be obtained at this office on application by mail or in person, must be securely attached to each copy of the proposal, and be considered as comprising a part of it. A written memoranda offered for inspection in connection with the drawings will also be considered a part and parcel of the proposal, and of any contract subsequently made in pursuance of it.

14. Proposals must be prepared without assistance from any person employed in or belonging to the military service of the United States or employed under this office.

15. No bidder will be informed, directly or indirectly, of the name of any person intending to bid or not to bid, or to whom information in respect to proposals may have been given.

16. Any one signing the proposal as the agent of another or others must file with it legal evidence of his authority to do so.

17. All blank spaces in the proposal and bond must be filled in, and no

change shall be made in the phraseology of the proposal, or addition to the items mentioned therein. Any conditions, limitations, or provisos attached to proposals will be liable to render them informal and cause their rejection.

18. Alterations by erasure or interlineation must be explained or noted in the proposal over the signature of the bidder.

19. If the bidder wishes to withdraw his proposal, he may do so before the time fixed for the opening, without prejudice to himself, by communicating his purpose in writing to the officer who holds it, and when reached it shall be handed to him or his authorized agent, unread.

20. Reasonable grounds for supposing that any bidder is interested in more than one bid for the same item will cause the rejection of all bids in which he is interested.

21. No bids received after the time set for opening of proposals will be considered.

22. The proposals and guaranties must be placed in a sealed envelope marked "Proposals for Gun Emplacements (or Wharf) on Great Diamond Island," and inclosed in another sealed envelope addressed to Lieut. Col. A. N. Damrell, Corps of Engineers, Portland, Maine. The outer envelope must be so indorsed as to indicate before being opened the particular work for which the bid is made.

23. The United States reserves the right to reject any and all bids, and to waive any informality in the bids received; also to disregard the bid of any failing bidder or contractor, known as such to the engineer department.

24. The bidder to whom award is made will be required to enter into written contract with the United States, with good and approved security, in an amount equal to about 33 per cent. of the amount covered by the contract, within ten (10) days after being notified of the acceptance of his proposal.

25. The contract which the bidder and guarantors promise to enter into shall be, in its general provisions, in the form adopted and in use by the engineer department of the army, blank forms of which can be inspected at this office, and will be furnished, if desired, to parties proposing to put in bids. Parties making bids are to be understood as accepting the terms and conditions contained in such form of contract.

26. The sureties are to make and subscribe affidavits of justification on the back of the bond to the contract, and they must jointly justify in double the amount of the penalty.

27. Bidders are invited to be present at the opening of the bids.

### General Conditions.

28. A copy of this advertisement, specifications, and instructions will be attached to the contract, and form a part of it.

29. The contractor shall, within ten days from the award of the contract, furnish the office with the post-office address to which communications should be sent.

30. Transfers of contracts, or of interests in contracts, are prohibited by law.

31. The contractor will not be allowed to take advantage of any error or omission in these specifications, as full instructions will always be given should error or omission be discovered.

32. The decision of the engineer officer in charge as to quality and quantity shall be final.

33. It is understood and agreed that the quantities given are approximate only, and it must be understood that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders are expected to examine the drawings, and are invited to make the estimate of quantities for themselves.

34. Payments. The work is to be done under the following provisions of the act of June 6, 1896: "That contracts may be entered into under the direction of the secretary of war, for materials and work for construction of fortifications, to be paid for as appropriations may from time to time be made by law." It is expected that congress will, in accordance with the provisions in the act quoted in this paragraph, make appropriations at such

times as to permit of the uninterrupted payments for the work covered by these specifications, but the contractor must take his own risk in this, and it is distinctly understood and agreed that the United States is in no case to be made liable for damages in connection with this contract on account of delay in payments on same due to a lack of available funds. There are no funds available for the work at the date of these specifications, but, when appropriations are made available by law, payments for work done will be made monthly, to such extent as said appropriations will permit, after providing for contingent expenses; ten per centum being reserved from each payment until the completion of the contract.

35. Should the time for the completion of the contract be extended, all expenses for inspection and superintendence during the period of the extension, the same to be determined by the engineer officer in charge, shall be deducted from payments due or to become due to the contractor: provided, however, that if the party of the first part shall, in the exercise of his discretion, because of freshets, ice, or other force or violence of the elements, allow the contractor additional time, in writing, as provided for in the form of contract, there shall be no deduction for the expenses of inspection and superintendence for such additional time so allowed: provided, further, that nothing in these specifications shall affect the power of the party of the first part to annul the contract as provided in the form of contract adopted and in use by the engineer department of the army.

36. It is understood and agreed that all drawings for this battery are to be kept in possession by the engineer officer in charge, and that the contractor or his agents are not to have possession of copies of them. The lines of the work are to be laid out by the engineer, and the contractor or his agents will be allowed to consult the drawings in the presence of the engineer or his agents. It is further understood and agreed that, should the contractor or his agents give undue publicity to the plans to any other party or parties, such action may cause the annulment of the contract, so far as the United States is concerned, with the forfeiture of all money due or to become due under it. All rights of action, however, to recover for such breach of contract by the contractor, are reserved to the United States. Persons desiring to see the plans for this battery must be known to the engineer in charge, or be vouched for to him. The order of the work will be fixed by the engineer in charge.

### Special Description.

37. Location and Character of Work. The location of the emplacements is at the northeasterly end of Great Diamond Island, Portland Harbor, Me., and about two miles northeasterly from the city of Portland. The site and adjacent territory is partly wooded. Solid ledge crops out in many places, and the depth of the overlying soil is supposed to average about 3 feet. The elevation of the site averages from 48 to 63 feet above mean low water. The mean tidal range is 9.1 feet. The average distance from the site to the high-water line is about 300 feet. The emplacements will consist of concrete, stone, earth, and metal work. All work connected therewith will conform to the lines and dimensions to be given by the engineer, and generally to the drawings exhibited, and to such others as may be furnished from time to time during construction. The drawings exhibited are intended merely to show the contractor the general character of the work, and it is understood and agreed that the engineer shall have the right to change or modify the plans as he may deem necessary, and that the contractor shall neither have nor make any claim against the United States on account of such changes.

38. Contract to Include. The contract will include all material and work, temporary and permanent, necessary to the entire completion of this project according to the true intent and meaning of these specifications. Within thirty days after the completion of the work, and before the final payment is made, all temporary buildings, unused material, rubbish, etc., must be removed or otherwise disposed of to the satisfaction of the engineer.

39. The Contractor to Furnish All Material and Work. The contractor, under his contract price, is to furnish and pay for all material and plant of every description, and everything entering into or connected with the tempo-

rary or permanent construction. He must also supply and pay for all work, skilled or otherwise, required to prepare and place the materials and complete the work according to drawings and specifications.

40. Excavation. The site of the battery and so much of the adjacent ground as will be needed for construction purposes will first be cleared of all woods. The soil will then be stripped from the site to be occupied by the emplacements and removed to some convenient place approved by the engineer, outside the limit of the work, to be used as hereinafter provided; the cost of any rehandling to be included in the price of the excavation. It must be deposited in piles so as to facilitate measurement. It will be estimated and paid for by the cubic yard, measured in the piles. The price paid shall include the removal of the woods. Excavation will then be made for magazines, passages, gun pits, and at such other places as the engineer may direct. The material is believed to be mostly solid rock, but the contractor should satisfy himself as to this, as no guaranty will be given as to the character of the material. All excavations shall conform to such lines, slopes, and grades as may be given by the engineer, and anything taken out beyond such given limits will not be paid for. All natural surfaces of the ledge, which are to form foundations for concrete, shall be well cleaned of all soil and vegetable matter, and shall be thoroughly cleaned before the concrete is deposited thereon. Should the excavated material prove suitable for broken stone for concrete and for quarry grout to be placed in concrete No. 1, for the body of the work, which question will be decided upon by the engineer officer in charge, the contractor may select from the excavated material suitable rock for that purpose. All the fine quarry refuse and other suitable material shall be deposited in front and on the sides of the concrete, as may be required, so as to form an embankment as shown on the plans, and shall be kept inside of the lines, slopes, and grades given; otherwise the excavated material shall be deposited at such places as the engineer may direct; but no material now upon the reservation shall be removed therefrom by the contractor. Rock excavation, including the removal and deposit of the excavated material, will be measured by cross sections of the place from which it was removed, and will be paid for by the cubic yard so measured. The top and side slopes of the embankment or parapet will be filled so as to give a subgrade about one foot below the finished grades, to receive one foot of top soil. The filling will be well rammed or compacted, and must be kept at a sufficient height above the subgrade to allow for shrinkage and settlement. The filling for a depth of 2 to 3 feet below the subgrade must be of selected material, free from stones larger than one inch. Should the fine quarry refuse and other material deposited in the embankment during the work of excavation prove insufficient in amount to bring the embankment up to the subgrade, the deficiency will be supplied by the contractor from areas designated by the engineer in charge. All material thus supplied will be measured in conveyances, and will be paid for by the cubic yard.

41. Soil Covering. The superior and other slopes of the earth parapet are to be covered with top soil to the depth of one foot, measured at right angles to the slope line. The soil first stripped from the site will be used for this purpose, and, if it does not yield a sufficient amount, an area of ground, to be designated by the engineer, will be stripped of the soil to supply the deficiency; and the material thus obtained will be measured in conveyances of known capacities, and will be paid for by the cubic yard as fill. The surface of the soil covering will be brought to exact line, slope, and grade, and neatly finished, and all weeds, roots, etc., raked from the surface.

42. Seeding Slopes. After the slopes have been covered with soil and finished as specified, they will be seeded (if practicable, just before rain) with grass seed of approved quality. The seed is to be carefully "brushed in" after sowing. The cost of seeding will be included in the price for fill.

43. Material. The contractor must keep on hand material in sufficient quantity that the work shall not be delayed for lack of proper material, and in order that opportunity may be had for the thorough test of any material in advance of its being needed for the work.

44. Cement—Portland Cement. The Portland cement must be of the best quality of hydraulic Portland cement, uniform in quality, finely ground, free

from lumps, and must be packed in strong, tight barrels, in such manner as to be secure from air and moisture. Each barrel must weigh not less than 375 pounds net. The cement must be slow-setting. At least 95 per 'cent. must pass through a sieve of 2,500 meshes to the square inch. Briquettes of peat cement kept one day in air must have a tensile strength of not less than 175 pounds to the section of 1 square inch; and kept one day in air and six days in water, not less than 400 pounds. The cement will be subjected to such other tests as the engineer may deem necessary.

American Natural Cement. The Natural cement is to be hydraulic, uniform in quality, fresh, dry, finely ground, free from lumps, and put up in good, sound barrels; each barrel of cement to weigh not less than 300 pounds net. A sample is to be submitted for test, and the entire quantity must be fully equal to the sample. The cement must not set within 20 minutes. Briquettes made of neat cement must have a tensile strength per square inch of not less than 60 pounds after exposure to the air for 24 hours; and kept 1 day in air and 6 in water, not less than 100 pounds; and kept 1 day in air and 27 in water, not less than 180 pounds. At least 90 per cent. must pass through a sieve of 2,500 meshes to the square inch. The cement will be subjected to such other tests as the engineer may deem necessary. All cement when opened must be perfectly dry and free from lumps or other imperfections. Each barrel must be labeled with the brand and name of the manufacturer, and each and every barrel may be tested by the engineer if deemed necessary. It must be stored in a dry place, and any deterioration from moisture or other cause will cause its rejection.

15. Sand. Sand must be clean, sharp, and silicious; free from dirt, organic matter, or other impurities. Bidders will submit samples of the sand they propose to furnish, labeled with name and location of deposit from which taken, and sand furnished must be equal in quality to the sample submitted.

46. Broken Stone. Broken stone for concrete will be of two sizes, the ordinary and granolithic. Both must be clean, hard, and durable, thoroughly screened, and otherwise subject to approval of the engineer. Ordinary stone must be of such sizes as to pass in any direction through a ring 2½ inches in diameter. The granolithic must pass through a ring ½ inch in diameter, and must be free from dust. Broken stone will also be used on roadways for blind drains, and at such other parts of the work as the engineer may require, and the quantities so used will be paid for in place by the cubic yard.

47. Quarry Grout. The stone must be of a kind satisfactory to the engineer as regards strength and durability. Granite rubble is preferred. If any other kind of stone is offered, a sample must accompany the bid, and the location of the quarry must be stated. Should the stone excavated from the site of the battery prove acceptable to the engineer officer in charge, as regards strength and durability, the contractor will be permitted to use the same for certain or all parts of the work, as the engineer may direct. Quarry grout will be paid for by the cubic yard, in place in the work.

48. Concrete. The concrete will be of three different kinds, viz.: No. 1 will be used for the body of the work, and will be made of one part (by volume) of natural cement, two parts sand, four parts of broken stone. Quarry grout, varying in size from 250 pounds to 2 tons, will be used in the body of the concrete, where directed. The proportion of this stone to concrete in which it is imbedded will probably be about one-third. No stone will be placed nearer than 1 foot to faces of walls nor to each other. No. 2 will be used for gun platforms, steps, inside walls, floors and roofs, etc., and will be composed of one part (by volume) of Portland cement, two parts sand, and four parts ordinary broken stone. No. 3 will be used on all outside surfaces to a depth of about six inches, and will be composed of one part (by volume) of Portland cement, 1½ parts sand, and two parts granolithic stone. Nos. 1 and 3 will be put in place at the same time, so as to secure a perfect bond. All concrete will be thoroughly mixed to the satisfaction of the engineer; the quantity of water used to be such that upon ramming the concrete in place the water will flush slightly to the surface. Concrete will not be dumped from a height greater than 5 feet. It will be laid immediately after being mixed, in layers not more than 6 inches in thickness, and thoroughly rammed with concrete rammers until the water flushes

to the surface. The top surface of each layer, before another is added, must be moistened, and have spread over it a thin layer of grout, made with cement and 'water. All the quarry grout placed into No. 1 concrete shall be evenly distributed, be free from dirt, shall be well moistened, and firmly bedded upon the concrete while still in a plastic state. The surfaces of the quarry grout must be clean and well moistened before the concrete is laid around them, and the concrete must be thoroughly rammed so as to insure a good bond. Concrete will be paid for by the cubic yard in place. The price paid for concrete will include the cost of all forms, shoring, etc., needed to hold the material in place. The concrete, when the forms are removed, must show smooth and true surfaces out of wind; and for this reason the surfaces of the frames in contact with the concrete must be planed, the joints closely fitted, and the frames set up to true lines in a substantial manner. Concrete placed by order of the engineer in charge, and damaged by the elements, will be removed, without costs to the United States, by the contractor, if so ordered by the engineer in charge, and, if so removed, will be paid for as concrete.

49. Brick Masonry. Brick masonry may be used for manholes, door jambs, and at such other places as the engineer in charge may direct. The best quality of hard-burned brick will be required, and will be laid moist on a full bed of Portland cement mortar, consisting of one part (by volume) of cement and two parts of sand. Brick masonry will be paid for by the thousand bricks laid.

50. Water. An artesian well, to supply fresh water, shall be sunk at a point to be designated by the engineer in charge, in close proximity to the work. The well will be sunk to such a depth as may be necessary to obtain satisfactory water in ample quantity, to be determined by the engineer. The well will be of 6 inches diameter, and will be fitted with a suitable steam pump, with boiler, of a capacity of not less than 2,000 gallons per hour. The pump and boiler must be of a design to be approved by the engineer, and must be established and housed. The contractor will have the use of this well and pump for supplying the necessary water for concrete, boilers, and other purposes, but must maintain it in serviceable condition. The price paid for the well will be per foot depth; and for the pump and boiler set up in place, a lump sum. The well will be provided with such lining as the engineer may deem necessary, the price to be included in the price of the well.

51. Frost. No concrete or other masonry work will be placed during freezing weather, except by special permission or direction of the engineer. The contractor must, at his own cost, protect the work from injury by frost or other causes.

52. Base Rings, Anchor Bolts, Anchor Plates, and Nuts. The base rings of the carriages will be furnished by the United States. If they arrive in time the contractor will be required to place them at his own cost, and under the direction and to the satisfaction of the engineer. There will be required for anchoring the base rings in the concrete 28 steel bolts 2½ inches in diameter and 103¾ inches long, and 24 steel bolts 2½ inches in diameter and 72¾ inches long, each provided with a cast-iron anchor plate and three wrought-iron nuts. Anchor bolts are to be of soft, open-hearth structural steel. Each finished bolt must be stamped with the melt number, and one extra bolt for test purposes must be supplied for each length, with the lot made from any particular melt; said bolt to be selected at random by the agent of the United States. The tensile strengths, limits of elasticity and ductility shall be determined by test pieces cut from the selected bolt. The bending test shall be made upon a test piece cut from the selected bolt and machined to one inch square in cross section. The material shall fulfill the following tests: Ultimate tensile strength from 56,000 to 62,000 pounds per square inch; elastic limit not less than one-half the ultimate strength; minimum elongation 25 per cent. in 8 inches; minimum reduction of area at fracture 50 per cent.; shall bend 180 degrees flat on itself without fracture on outside of bent portion. The finished bolts must be free from injurious seams, flaws, or cracks, and have a workmanlike finish. Anchor plates are to be of tough, gray cast iron, free from injurious cold-shorts or blowholes, cored and bev-

eled as shown on the drawings; the holes in the anchor plates to be roughly finished to fit the bolts, the surfaces under the head of the bolt affording a true bearing. Bottom nuts of anchor bolts to be square, and one-half thicker than U. S. standard, of best quality of wrought iron, hot pressed, smooth forged and not finished; top nuts to be hexagonal, hot pressed, and of same quality and finish as bottom nuts, conforming to the U. S. standard in size, except thickness of jam nuts. Detailed dimensions of bolts, plates, and nuts are to be obtained from the drawings. The approximate weight of bolts, plates, and nuts is 9,840 pounds.

53. Drainage. Vitrified sewer pipe of approved make will be laid as shown on the drawings. Brick catch-basins connecting with the main drain will be built as shown, and all openings provided with cast-iron rings and perforated covers, of approved design. All the work is to be done according to standard sewer practice. Whenever considered necessary by the engineer in charge, blind drains, consisting of either porous tiles or broken stone, will be laid to his satisfaction. The excavation, including back fill, of all trenches for drains, will be paid for by the cubic yard, as excavation. All ironwork will be paid for in place by the pound. Porous tiles and vitrified pipe, inclusive of elbows, etc., will be paid for in place by the foot. All concrete used in connection with the drainage system will be No. 2 concrete, and will be estimated and paid for.

54. Cast Iron. All cast iron for gearing, sheaves, machinery, basin heads, gratings, washers, etc., is to be the best quality of tough, gray cast iron, without the admixture of cinder iron or other inferior metal. Castings must conform to plans furnished, and must be free from scoria, blowholes, air bubbles, cold-shorts, cracks, or any other defects or imperfections, and of a quality satisfactory to the engineer. Each casting shall be well cleaned. Castings for drain covers, rims, gratings, etc., will be coated with coal pitch and oil, as is usually done with water pipe; the coating to be applied at a proper heat and in a proper manner before any rust sets in.

55. Material Deposited in Disregard of Instructions. Material of any kind deposited in disregard or absence of instructions shall, if required by the engineer, be removed by the contractor at his own cost.

56. Steel Beams. Steel I beams and channels will be used in the roofs of the rooms, passages, and magazines of the battery. They will be of standard make, subject to the approval of the engineer, and will be paid for in place by the pound. The price paid will include the setting, fitting, and the drilling of all bolt holes, and all fittings, as bolts, nuts, washers, rods, and connecting angles, used in securing them.

57. Trolleys. Steel trolley rails or tracks of approved design will be suitably fastened to the roofs of the magazines and passages, as shown on the plan. Each track will be provided with two trolleys of approved design, with differential blocks, all adapted to handling a load of 1,500 pounds. The trolleys and tracks will be paid for by the pound in place. The price paid will include the drilling of all bolt holes, and all fittings necessary to secure them in place ready for service.

58. Cranes. There will be required four simple crane masts of medium forged steel, and of shape and dimensions as shown on detailed plans. Each crane mast is to be fitted with a block of a hoisting capacity of 1,500 pounds, equal or superior to a Yale Weston triplex block, adjusted to a velocity ratio not less than 11 to 1. The price paid will be per crane, with block complete, and shall include all labor and materials necessary to secure the crane in place, ready for service.

59. Ammunition Lifts. Two lifts, each consisting of a pair of platforms counterbalancing each other, are to be arranged in the lift wells of each emplacement as shown. All details need not conform to those indicated, but commercial articles which are acceptable mechanical equivalents may be substituted. The ruling dimensions must be rigorously adhered to. The lifts shall be arranged to be worked either by hand or electric power. Each crab of the double lift will be so built that it can be worked by electric motor, but the motor is not to be furnished by the contractor. The lifts must be furnished and set up by a manufacturer skilled and experienced in this class

of work. A lump sum will be bid for each lift, complete, including guides, casings, and all accessories shown.

60. Doors. Doors will be fitted to the magazines, passages, and rooms. They will be made of steel, according to detailed plans. They will be hung with bronze hinges and gudgeons of approved quality, as shown on plan, and will be secured with bronze staples and locks of approved design. The doors will be paid for by the pound in place, including all fittings and fastenings. There will be required 6 double-leaf doors for 4-foot openings, 4 double-leaf doors for 6-foot openings, all hung with bronze hinges, and 4 shutter doors for 4-foot openings, secured by steel crossbars. Also 8 steel doors for openings in lift wells.

61. Signaling and Lightning. Brass speaking tubes 1¼ inches diameter will be laid on the lines indicated. All turns will be made on radii not less than two feet, and all ends must be cut square and true, and made up to a close contact within the couplings. The exposed ends will be threaded and capped. Tubes will be estimated and paid for by the running foot. At all places where the electric light circuit passes through walls, openings shall be provided as shown on plans. These openings shall be lined with cement pipe, 4 inches diameter, which will be paid for by the running foot in place.

62. Ladders. Iron ladders will be placed where shown in the drawings. They will be paid for by the ladder in place.

63. Railings. Iron railings three feet high will be placed where shown on the drawings. The railings are to be constructed in such a manner as to be removable. They will be paid for by the set in place.

64. Painting. All doors and other ironwork must be painted with three coats of red lead, or such other paint as the engineer in charge may direct; and, at the discretion of the engineer, all the interior walls will be white-washed, or painted 2 coats. The cost will be included in the cost of the work to which applied.

65. Bricks. To be selected hard burnt, of uniform texture and color, and with true angles and faces.

66. Roadway. The roadway in the rear of the battery shall be finished with a 4-inch layer of ordinary broken stone, which must be well compacted and covered with 1 inch of sand. The roadbed shall conform to the grades as shown on the plan. The broken stone will be paid for by the cubic yard in place and the sand will be paid for as fill.

67. Purchases Made or Work Done not Specified. If at any time it should become necessary, in the opinion of the engineer officer in charge, to do any work or supply any materials not herein specified, for the proper completion of this contract, the contractor will be required to furnish the same at the current rates existing at the time of said purchase or work; the current rates to be determined by the engineer officer in charge.

68. Competent Men to be Employed. The contractor will be required to employ only skillful and competent men to do the work herein specified. If any person employed by the contractor on the work appears to the engineer to be incompetent or disorderly, or shall refuse or neglect to obey the directions of the engineer, his assistants or inspectors, in anything relating to the work, or shall perform his work in a manner contrary to the specifications, or attempt to secure the acceptance of any imperfect work or materials, such person shall be discharged immediately, on the request of the engineer, and shall not be again employed or allowed upon the work.

69. Inspection, Rejected Material, etc. The work will be conducted under the direction of the engineer in charge, who shall have the power to prescribe the order and manner of executing the same in all its parts; of inspecting and rejecting materials, work, and workmanship which in his judgment do not conform to the drawings that may be furnished from time to time, or to these specifications. And any material, work, or workmanship so rejected by him shall be kept out of or removed from the finished work, and no estimate or payment shall be made until such material, work, or workmanship be so removed.

70. When so required, rejected material shall be piled up in sight near the works, and kept there until the engineer gives permission to have it removed.

71. The United States will keep inspectors on the work, who will receive

instructions from the engineer. They will have power to object to any materials, work, or workmanship. Any material, work, or workmanship objected to by the inspectors shall be kept out of or removed from the finished work, unless in each particular case the objection of the inspectors shall be overruled by the engineer; and, unless the objection be so overruled, no estimate or payment shall be made until such material, work, or workmanship be so removed.

72. The engineer shall have the power to overrule or rescind any or all objections or decisions of the inspectors.

73. The decision of the United States engineer officer in charge of the work will be final and conclusive upon all matters relating to the work, and any doubt as to the meaning of these specifications, and any obscurity in the wording of them, will be explained by the engineer, who shall have the right to correct any errors or omissions in them, when such correction is necessary for the proper fulfillment of their intention.

74. The contractor shall commence operations within thirty days after notification of award of contract, and shall complete all work by December 1, 1897. The monthly rate of work shall not be less than $10,000 worth for any month, and the average rate must be such as to insure the completion of the work by the date specified.

75. Failure to Prosecute or Protect Works. If at any time the contractor shall refuse or fail to prosecute the work or provide for carrying on the same as directed by the engineer, or fail to properly protect any part of the work, permanent or temporary, the engineer shall have the power to employ men, to purchase or otherwise provide materials, tools, machinery, etc., and put the work in proper advancement or condition, and the entire cost of so doing shall be deducted from payments to be made under this contract.

76. Work at Night. It is expected that the work will be prosecuted with a good force during the day. The engineer may, however, permit the contractor to work at night. If work is carried on at night, the works must be well lighted for operations by the contractor at his own cost, by approved apparatus.

77. Stakes, Templates, etc. The lines and levels for the work having been given on the ground by the engineer or his agent, the contractor must conform and keep thereto; and all stakes and benches, after being placed, must be kept in position by the contractor without cost to the United States. The contractor shall furnish, at his own expense, the stakes required to lay off the work, as well as the labor required to set and place them. He will also be required to furnish, without cost to the United States, all templates, patterns, or platforms that may be required in any part of the work.

78. Drawings. In case the contractor, under any option granted in these specifications, or by competent authority during construction, proposes to substitute a mechanical equivalent for any detail shown in the drawings, he shall first submit to the engineer officer in charge a detail drawing of the same, with specifications for its construction, or a copy of a trade catalogue in which it is fully illustrated and described.

79. The contractor shall provide, without cost to the United States, a separate building, on a location selected by the United States engineer in charge, for use as an office for the United States inspector. It shall be weather-proof, tight, and well lighted, and provided with locks and keys.

80. Contractor and His Employés. The contractor must personally superintend the work during its progress, or have it personally superintended by a skilled and responsible representative; and the contractor must comply in every respect with the instructions of the engineer officer in charge, or his representative, as to the order and extent of the work to be done, and the rate of its progress.

81. Working Plant. The bidder must satisfy the United States of his ability to furnish the materials and perform the work for which he bids. He will state whether he has ever been engaged on any contract or other work under the United States; giving, if so, the location of the work, the year in which it was done, and the manner of its completion. The working plant of the contractor will be kept in good order, and be of such capacity as the engineer officer in charge shall deem necessary for the vigorous prosecution of the work.

82. Extra Work. No claims for extra work beyond that shown on the plans or ordered by the engineer at contract prices, or for delay of any kind, will be considered or paid unless an agreement therefor shall be made in writing, and approved by the chief of engineers, U. S. army. The contract prices are to be full compensation for furnishing all the materials, labor, and appliances necessary, and for doing all the work herein specified.

83. Risk of Work. The work, as it progresses, will be and remain at the risk of the contractor until it has been approved and accepted.

84. Wharf. The contractor will be required to build a wharf, consisting of a road and landing, on the northerly end of the island. The wharf will be built in accordance with the drawings exhibited in this office, and will be carried out to a depth of 8 feet at mean low water, or such other depth as the engineer may require. The exact site of the wharf will be determined by the engineer. The walls of the pier or landing up to the high-water level will be built of split granite dry rubble masonry in courses. No course shall have a rise less than 18 inches. Each course shall be built with alternate headers and stretchers as near as the shape of the stone will admit. No stone shall weigh less than 1 ton, and the bulk of the stones shall weigh from 2 to 5 tons each. All stones shall be firmly bedded, and must be laid so as to break joints with the course below. No pinners will be allowed. After completion of every 2 courses the interior space shall be filled with random stone to a height nearly level with the top of the finished course. The filling must be carefully placed so as to reduce the voids between the stones to a minimum. A course 3 feet high shall be built above high-water level, of rubble masonry laid in Portland cement mortar, of 1 part Portland hydraulic cement (by volume), 2 parts sand, and 2 parts gravel. A top or coping course of selected split granite of about 18 inches rise, consisting of stones not less than 3 feet wide and 4 feet long, with outside joints not larger than two inches, shall be laid in a bed of cement mortar, and the vertical joints well filled with mortar. The top of this course must be level. The filling between the walls, above high water, shall be of stone decreasing in size; and the top of the landing shall have a layer of 6 inches of broken stone, well compacted and leveled. Sound and straight oak fender piles of an average mean diameter of 10 inches shall be strongly and suitably fastened along the front face of the wharf, about 8 feet apart, and at each corner there shall be 3 fender piles. Near each corner of the wharf shall be placed a suitably finished belaying post of white oak, 12 inches in diameter, and 12 feet long. They shall project 4 feet above the top of the wharf, and be imbedded in the stone filling for a distance of 8 feet. The price for the fender piles and belaying posts will be per piece in place. A roadway 16 feet wide, connecting this pier with the shore, shall be built of random quarry grout, carefully dumped in place, having side slopes of 1 on 1. Stone which forms the slopes shall weigh from 1 ton upward, and shall be substantially placed to conform as nearly as practicable to the slope lines. The top shall be finished with stone decreasing in size so as to form a hard and smooth roadway. All the work shall be done to the satisfaction of the engineer in charge. The stone of the pier wall up to the level of high water will be paid for in place, by the ton of 2,000 pounds, measured by displacement on board of vessel. The 3-feet course above high-water level (laid in cement mortar) will be paid for by the cubic yard in place. The coping course will be paid for by the ton of 2,000 pounds. The filling of the pier, including the "finishing of the top" and the stone for the roadway, will be measured and paid for by the cubic yard in place. The prices bid shall include all the material, appliances, and labor required for the completion of the work as specified. The contractor will be allowed to use material from the reservation, when the same is suitable, to be taken from such places as shall be approved by the engineer officer in charge. The contractor for the emplacements will have the use of the wharf during the time of construction of the battery: provided, however, that he will repair all damages done during its use, to the satisfaction of the engineer.

85. Road from High-Water Level to the Battery. The contractor is required to build a roadway 16 feet wide, with an open ditch of dimensions shown on plan, from the site of the battery to high-water line, connecting

with the roadway to the wharf. Excavation for the road and ditch shall be made on lines and grades as given by the engineer in charge. The excavated material shall be deposited at such places as the engineer may direct. If placed in the wharf or roadway, it will not be again paid for as filling. The roadway shall be prepared with a covering of such material as will be suitable and available to insure a good, hard, smooth road. The contractors will be required to maintain all roads built under this contract in good and serviceable condition, and have them so at the completion of the work. The price bid for construction of this road and ditch shall be for excavation per cubic yard in place, and shall include the removal of the excavated material to the places designated by the engineer, and shall also include all the work necessary for the proper completion of the road and ditch. All work must be done to the satisfaction of the engineer in charge.

Form 19.

This agreement, entered into this second (2d) day of March, eighteen hundred and ninety-seven, between Lieut. Col. A. N. Damrell, corps of engineers, United States army, of the first part, and William Morgan, of Trenton, in the county of Mercer, state of New Jersey, of the second part, witnesseth, that in conformity with the advertisement and specifications hereunto attached, which form a part of this contract, the said Lieut. Col. A. N. Damrell, for and in behalf of the United States of America, and the said William Morgan, do covenant and agree to and with each other as follows:

The party of the second part agrees to construct gun emplacements at Great Diamond Island, Portland Harbor, Maine, in the manner and according to the terms prescribed in the specifications hereunto attached, and to receive as full compensation for the same the following named prices, viz.:

(1) For earth excavation (including the removal of woods) thirty-four cents (34c.) per cubic yard.
(2) " rock excavation in place, one dollar and fifty cents ($1.50) per cubic yard.
(3) " earth fill, twenty-nine cents (29c.) per cubic yard.
(4) " bricks in place, eighteen dollars ($18.00) per thousand.
(5) " concrete No. 1 in place, three dollars and eighteen cents ($3.18) per cubic yard.
(6) " concrete No. 2 in place, five dollars and sixty-four cents ($5.64) per cubic yard.
(7) " concrete No. 3 in place, eight dollars ($8.00) per cubic yard.
(8) " quarry grout, seventy-five cents (75c.) per cubic yard.
(9) " broken stone (not in concrete) in place, seventy-five cents (75c.) per cubic yard.
(10) " steel beams, channels, etc., in place, three cents (3c.) per pound.
(11) " steel trolley rails and trolleys in place, ten cents (10c.) per pound.
(12) " brass tubing, fifty cents (50c.) per linear foot.
(13) " castings for drain covers, rings. etc., three cents (3c.) per pound.
(14) " 12-inch vitrified sewer pipe in place, fifty cents (50c.) per linear foot.
(15) " 8-inch vitrified sewer pipe in place, forty cents (40c.) per linear foot.
(16) " 4-inch vitrified sewer pipe in place, thirty cents (30c.) per linear foot.
(17) " 4-inch cement pipe in place, fifty cents (50c.) per linear foot.
(18) " steel bolts, with plates and nuts, in place, eight cents (8c.) per pound.
(19) " iron ladder in place, twenty-five dollars ($25.00) each.
(20) " iron railings in place, fifty dollars ($50.00) per set.
(21) " ammunition cranes, complete, in place, one hundred and twenty-five dollars ($125.00) per crane.
(22) " ammunition lifts, complete, in place, seven hundred and fifty dollars ($750.00) per lift.
(23) " doors in place, eight cents (8c.) per pound.
(24) " artesian well, including lining, seven dollars and fifty cents ($7.50) per foot depth.
(25) " steam pump and boiler, three hundred and fifty dollars ($350.00.)

And the party of the first part agrees to pay to the said party of the second part the above-named prices for constructing the said gun emplacements as

specified. All materials furnished and work done under this contract shall, before being accepted, be subject to a rigid inspection by an inspector appointed on the part of the government, and such as do not conform to the specifications set forth in this contract shall be rejected. The decision of the engineer officer in charge as to quality and quantity shall be final. The said William Morgan shall commence the work under this contract on or before the first (1st) day of April, eighteen hundred and ninety-seven (1897), and shall complete the same on or before the first (1st) day of December, eighteen hundred and ninety-seven (1897). If, in any event, the party of the second part shall delay or fail to commence with the delivery of the material or the performance of the work on the day specified herein, or shall, in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements of this contract, then, in either case, the party of the first part, or his successor legally appointed, shall have power, with the sanction of the chief of engineers, to annul this contract, by giving notice in writing to that effect to the party (or parties, or either of them) of the second part; and, upon the giving of such notice, all money or reserved percentage due or to become due to the party or parties of the second part by reason of this contract shall be and become forfeited to the United States; and the party of the first part shall be thereupon authorized, if an immediate performance of the work or delivery of the materials be, in his opinion, required by the public exigency, to proceed to provide for the same by open purchase or contract, as prescribed in section 3709 of the Revised Statutes of the United States: provided, however, that if the party (or parties) of the second part shall, by freshets, ice, or other force or violence of the elements, and by no fault of his or their own, be prevented either from commencing or completing the work or delivering the materials at the time agreed upon in this contract, such additional time may, in writing, be allowed him or them for such commencement or completion as in the judgment of the party of the first part, or his successor, shall be just and reasonable; but such allowance and extension shall in no manner affect the rights or obligations of the parties under this contract, but the same shall subsist, take effect, and be enforceable precisely as if the new date for such commencement or completion had been the date originally herein agreed upon. If at any time during the prosecution of the work it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the secretary of war: provided, that no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred. No claim whatever shall at any time be made upon the United States by the party or parties of the second part for or on account of any extra work or material performed or furnished, or alleged to have been performed or furnished, under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or materials shall have been expressly required in writing by the party of the first part or his successor, the prices and quantities thereof having been first agreed upon by the contracting parties and approved by the chief of engineers. The party of the second part shall be responsible for and pay all liabilities incurred in the prosecution of the work for labor and material. It is further understood and agreed that, in case of failure on the part of the party of the second part to complete this contract as specified and agreed upon, that all sums due and percentage retained shall thereby be forfeited to the United States, and that the said United States shall also have the right to recover any or all damages due to such failure in excess of the sums so forfeited, and also to recover from the party of the second part, as part of said damages, whatever sums may be expended by the party of the first part in completing the said contract, in

excess of the price herein stipulated to be paid to the party of the second part for completing the same. Payments shall be made to the said William Morgan as specified when the work contracted for shall have been delivered and accepted, reserving ten (10) per cent. from each payment until the whole work shall have been so delivered and accepted. Neither this contract nor any interest therein shall be transferred to any other party or parties, and in case of such transfer the United States may refuse to carry out this contract either with the transferror or the transferee, but all rights of action for any breach of this contract by said William Morgan are reserved to the United States. No member of or delegate to congress, nor any person belonging to or employed in the military service of the United States, is or shall be admitted to any share or part of this contract, or to any benefit which may arise herefrom. This contract shall be subject to approval of the chief of engineers, U. S. A.

In witness whereof, the parties aforesaid have hereunto placed their hands the date first hereinbefore written.

Witnesses:

C. F. Porter,                as to            A. N. Damrell,
                    Lieut. Colonel, Corps of Engineers.
Chas. R. Hall,              as to           William Morgan.

(Executed in Quintuplicate.)

Approved: March 16, 1897.                    A. MacKenzie,
                                    Acting Chief of Engineers.

I do solemnly swear that the copy of contract hereto annexed is an exact copy of a contract made by me personally with ————; that I made the same fairly, without any benefit or advantage to myself, or allowing any such benefit or advantage corruptly to the said ————, or any other person; and that the papers accompanying include all those relating to the said contract, as required by the statute in such case made and provided.

————————————, Corps of Engineers.

Subscribed and sworn to before me this ——— day of ———, 189—.

(2) Morgan, as principal, and the American Surety Company of New York, as surety, executed and delivered to the United States a bond of which a copy is as follows:

(No. 100.   Form H.)

Contractor's Bond (Public Works).

(When Principal is an Individual or a Partnership, and Surety is a Corporation.)

Know all men by these presents, that we, William Morgan, as principal, and American Surety Company of New York, a corporation existing under the laws of the state of New York, as surety, are held and bound unto the United States of America in the penal sum of eighteen thousand (18,000) dollars, to the payment of which sum, well and truly to be made, we bind ourselves, our heirs, executors, administrators and successors, jointly and severally, firmly by these presents. The condition of this obligation is such that whereas the above-bounden William Morgan has on the second day of March, 1897, entered into a contract with the United States, represented by Lieut. Colonel A. N. Damrell, corps of engineers, U. S. army, for constructing gun emplacements at Great Diamond Island, Portland Harbor, Maine: Now, therefore, if the above-bounden William Morgan, his heirs, executors, or administrators, shall and will in all respects duly and fully observe and perform all and singular the covenants, conditions, and agreements in and by the said contract agreed and covenanted by said William Morgan to be observed and performed, according to the true intent and meaning of the said contract, and as well during any period of extension of said contract that may be granted on the part of the United States as, during the original term

of the same, and shall promptly make full payments to all persons supplying him labor or materials in the prosecution of the work provided for in said contract, then the above obligation shall be void and of no effect; otherwise to remain in full force and virtue.

In witness whereof, the parties hereto have executed this instrument this 2d day of March, 1897; the name and corporate seal of said surety being hereto affixed and these presents duly signed by its 2nd vice president & asst. secretary, pursuant to a resolution of its board of trustees, passed on the 12th day of April, 1893, a copy of the record of which is on file in the war department.

In presence of

Chas. R. Hall,      as to   William Morgan.
Howard Allison,   as to   American Surety Company of New York,
                                         David B. Sickles, 2d Vice President.
Attest: George L. Holmes, Asst. Secretary.

(3) Morgan entered upon the performance of his contract aforesaid, and after a time abandoned its further prosecution.

(4) While prosecuting the work the plaintiff, the Thomas Laughlin Company, supplied to Morgan material to be used by him in his work, amounting to the sum of $4,389.86.

(5) It is admitted that of this sum the just price of iron beams, bolts, and washers which were required for the work contracted for, and which actually entered into the construction of the same, was $2,107.22 at Portland, and that interest on so much of the same as may be allowed by the court is to be computed from July 29, 1898, and added to the $2,107.22.

(6) The plaintiff also paid thirty dollars ($30), the expense in transporting from Portland to Diamond Island, where they were used under the contract, the beams, bolts, and washers referred to in finding numbered 5.

(7) The plaintiff also supplied to Morgan nails used in the construction of a pump house required by the contract, and the construction of the false works or wooden forms about which the concrete was placed in building the emplacements, so as to give the concrete form, amounting to $27.82 at fair price.

(8) Morgan had a steam launch expressly constructed for and used by him in transporting merchandise to be used in the work contracted for by him. For tackle, apparel, and furniture in fitting out and equipping this steam launch, the plaintiff performed work and furnished material to the fair amount of $15.29.

(9) For the construction of dump cars, skips, grout tubs, and conveyors constructed for the prosecution of said contract, and actually used at Diamond Island in making the excavations called for by the contract of Morgan, and conveying the materials excavated, the plaintiff demands $769.07. The rate of charges is fair and right, and the items of the charges are correct, and were actually furnished to the contractor.

(10) The plaintiff also furnished rails, spikes, and fish plates for the construction of a track upon which the cars were run to transport the earth and rock excavated preparatory to the building of the gun emplacements, and afterwards for conveying concrete for building the battery, to the amount of $312.65.

(11) He also furnished wire, steel, and rope of the value of $581.55

for setting up and sustaining derricks for hoisting out excavated material, and for putting concrete and materials into place in the excavations.

(12) Nails, screws, bolts, and similar articles used in the construction of sheds on the premises, for the storage of cement, and in making repairs to the plant used in the prosecution of the work specified in contract, were furnished to the value of $209.43.

(13) Plaintiff also supplied shovels, pickaxes, bars, hammers, and other similar tools used in the prosecution of the work called for in Morgan's contract, valued at $197.82.

(14) Also supplied $39.41 worth of shafting and pulleys necessary for the construction and operating a mixer with which to mix cement, and other materials required in the prosecution of the work.

(15) Plaintiff also furnished to Morgan a smokestack to a boiler used in making steam with which to run the mixer, hose, or the conveying of steam and lubricators, $66.67; tin and tarred paper used in the construction of buildings on the premises for storage, $7.64; hogsheads for storing water to be used in prosecuting the work, and bags for the handling of coal, $13.55; and screws to drills used in excavating, $6.48.

(16) Also locks on buildings on the premises used by the contractor for storage of tools and cement were furnished by this plaintiff, for which the proper price is $1.30.

(17) Morgan paid to this plaintiff on account:

| | |
|---|---:|
| August 23, 1897 | $300 00 |
| September 24, 1897 | 300 00 |
| November 15, 1897 | 200 00 |
| A total of | $800 00 |

Neither Morgan nor the plaintiff made special appropriation of any portion of these payments to any specific items or class of items of the plaintiff's account. The items supplied by and charged in the account of the plaintiff prior to June 30, 1897, slightly exceeded the total of the above payments on account. None of those items are included in findings 1, 2, and 3, above stated; but they are all included in the above findings of fact, numbered 8 to 16, inclusive. Writ dated July 29, 1898.

The court's conclusions of law on the foregoing facts are as follows, viz.:

The rights and obligations of the parties, respectively, are based on the act of congress approved August 13, 1894 (28 Stat. 278, c. 280), pursuant to which act the bond was given.

(a) Under that statute and the bond aforesaid, the plaintiff is entitled to recover in this action the sum of $2,107.22, admitted to have actually entered into the construction of the work as stated in finding of fact aforesaid numbered 5, together with interest on said sum from July 29, 1898, to the date of judgment.

(b) The sum of $30 named in the above finding of fact numbered 6 is also legally recoverable in this action, with interest as in ruling "a"; this expense of freight being properly added to the price of the material at Portland.

(c) He should also recover the $27.82, under finding of fact numbered 7, and interest from June 29, 1898.

(d) The charges of $15.29 under finding No. 8 do not come within the provisions of the act of congress or of the bond, and are not recoverable in this action.

(e) The items under finding numbered 9 are not recoverable. They did not enter into the construction of the public work, but were in the nature of tools and appliances to be used by the contractor for his own convenience and advantage in his execution of his contract.

(f) The ruling of the court is that the plaintiff cannot recover in this action the sum of $312.65 named in finding No. 10, this ruling being for the same reasons stated in "e."

(g) For the same reason the several items specified in finding 11 are not allowed; nor are those enumerated in finding 12 allowed; nor the charge of $197.82 for tools specially referred to in finding 13; nor $39.41 charged for shafting and pulleys under finding 14; and for the same reason the several items for articles named in finding 15 are disallowed.

(h) The contract called for a building to be used as an office by the engineers of the government, and for a lock on the same. For these the party furnishing material would have the right to proceed against the surety to recover any unpaid portion. But the evidence in this case does not show anything relating to this matter.

(j) The court rules that the payments found under the seventeenth finding of fact are to be applied to payment of the materials furnished and charged prior to the dates of the payments.

Summing up the conclusions of the court, the plaintiff should have judgment for $2,107.22 under finding of fact No. 5; for $30 under finding of fact No. 6; for $27.82 under finding of fact No. 7,—a total of $2,165.04,—with interest from June 29, 1898, to the date of judgment, with costs.

The court cannot properly enter judgment until certain proceedings in equity are disposed of, which proceedings relate to the same controversy in this case, and are pending in this court on the equity side.