NATIONAL SURETY CO. v. UNITED STATES, for Use of PITTSBURGH & BUFFALO CO. et al.

(Circuit Court of Appeals, Sixth Circuit.   January 14, 1916.)

No. 2651.

1. COURTS ⬤424—UNITED STATES COURTS—FORM OF ACTIONS—LAW OR EQUITY.

Act Aug. 13, 1894, c. 280, 28 Stat. 278, as amended by Act Feb. 24, 1905, c. 778, 33 Stat. 811 (Comp. St. 1913, § 6923), requires contractors with the United States to give a bond, with the additional obligation that the contractor shall promptly pay all persons supplying labor and materials in the prosecution of the work, and provides that any person, etc., furnishing labor or materials "used in the construction or repair of any public building or public work," may intervene in an action instituted by the United States on such bond; that, if no suit shall be brought by the United States, any person supplying labor and materials may sue thereon in the name of the United States; that, where suit is instituted by any such creditor, only one action shall be brought, and any other creditor may file his claim therein and be made a party thereto; and that, if the recovery on the bond is inadequate to pay the amounts found due, judgment shall be given to each creditor pro rata. *Held*, that while there is force in the argument that a court of equity is the appropriate tribunal when such action is brought by a creditor, the District Court had jurisdiction of such an action, though brought on the law side of the court, especially as Judicial Code, § 274a, as added by Act March 3, 1915, c. 90, 38 Stat. 956, provides that when a suit at law should have been brought in equity, or a suit in equity at law, the court shall order any amendments to the pleadings necessary to conform them to the proper practice, and that any party may at any stage of the cause amend his pleadings, so as to obviate the objection that the suit was not brought on the right side of the court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1119, 1125–1129; Dec. Dig. ⬤424.]

2. UNITED STATES ⬤67—CONTRACTORS' BONDS—CLAIMS SECURED.

In determining what claims are secured by the bond of a contractor with the United States, given pursuant to Act Aug. 13, 1894, as amended by Act Feb. 24, 1905, the provision of the statute authorizing only the one furnishing labor and materials "used in the construction or repair" of any public building or public work to intervene in any suit on the bond by the United States must be given due force.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ⬤67.]

3. UNITED STATES ⬤67—CONTRACTORS' BONDS—CLAIMS SECURED—"LABOR FURNISHED OR MATERIALS USED IN CONSTRUCTION OF THE WORK."

Groceries and provisions, furnished to a boarding house of a contractor with the United States, and consumed by his laborers, did not constitute "labor furnished or materials used in construction of the work," and payment therefor was not secured by the contractor's bond, given pursuant to Act Aug. 13, 1894, as amended by Act Feb. 24, 1905, and it was immaterial that the character of the country where the work was done made it necessary for the contractor to board its men on the job.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ⬤67.

For other definitions, see Words and Phrases, Second Series, Labor and Material.]

4. UNITED STATES ☜67—CONTRACTORS' BONDS—CLAIMS SECURED.

The bond of a contractor with the United States did not secure payment for machinery and appliances intended to be used in one location after another until worn out, though because of the length of the job they were so much or so badly used upon the particular contract as to become worn out.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ☜67.]

5. UNITED STATES ☜67—CONTRACTORS' BONDS—CLAIMS SECURED—"CONSTRUCTION OF THE WORK."

Supplies furnished a contractor with the United States, which were specifically intended for current consumption directly on the work, such as drills and material for drills used in drilling machines, and made to be used up currently, and in fact used up in direct and immediate contact with rock removed as part of the contract, were covered by the contractor's bond; the removal of such rock being a part of the "construction of the work."

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ☜67.

For other definitions, see Words and Phrases, First and Second Series, Construction.]

6. UNITED STATES ☜67—CONTRACTORS' BONDS—CLAIMS SECURED.

The bond of a public contractor engaged in deepening the channel of a river did not secure payment for ordinary and current repairs on the contractor's machinery, and miscellaneous articles used in the operation of the boats and dredges, constituting additions to the contractor's working outfit, or intended to maintain the existing outfit in as good order as possible against wear and depreciation.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ☜67.]

7. APPEAL AND ERROR ☜1172—DISPOSITION OF CAUSE—REVERSAL IN PART.

In a creditor's action on a contractor's bond given pursuant to Act Aug. 13, 1894, as amended by Act Feb. 24, 1905, where the judgment in favor of a number of claimants was in the form of a single entry, there was no insuperable difficulty in allowing part to stand, though the judgment was reversed as to other claims, as the judgment could be treated as separate judgments in favor of each of the successful claimants.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4555–4561; Dec. Dig. ☜1172.]

In Error to the District Court of the United States for the Southern Division of the Western District of Michigan; Clarence W. Sessions, Judge.

Action by the United States, for the use of the Pittsburgh & Buffalo Company and others, against the National Surety Company. Judgment in favor of claimants, and defendant brings error. Affirmed in part, and reversed in part.

The Standard Contracting Company received an award from the United States for deepening the channel in a portion of St. Mary's river, and entered into a contract to do the work pursuant to the award. It gave to the United States the bond required by the act of August 13, 1894, as amended February 24, 1905, with the National Surety Company as surety, and in the sum of $25,000. Before completing the work, the contractor failed, and the job was finished by its receiver. In the court below, sitting as a court of law, suit was commenced by summons by the Pittsburgh & Buffalo Company, as plaintiff, but in the name of the United States, against the contractor and the surety, as defendants. The suit was based upon the bond, and was to

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

recover an unpaid balance of $4,200 owing for coal furnished by the Pittsburgh & Buffalo Company to the contractor company for its necessary use in the dredging and other work required by the contract. Subsequently there were ten intervening claims: By Hanna & Co., for coal, $4,200; by the Pluto Powder Company for dynamite and electric exploders, $6,180; by the Pattison Supply Company for iron, machinery, hardware, and general supplies, $3,500; by George Kemp for coal, $3,000; by the Soo Hardware Company for supplies for dredges, tugs, and drill boat, which supplies consisted of oil, paint, nails, rope, valves, round iron, etc., $500; by the George Worthington Company for hardware, and supplies, $1,900, which hardware and supplies consisted of nuts, bolts, valves, packing, files, iron pipe, square iron, etc.; by the Upson-Walton Company for cordage, tackle, ship supplies, and ship chandlery articles, $900; by the Cleveland Steel Casting Company for miscellaneous castings as ordered, $200; by J. P. Brogan for groceries and supplies for the company boarding house, $4,600; by David Helman for oak timbers, $600. The surety appeared and pleaded to the merits to the original claim and separately upon each intervention. The summons was served by publication against the contractor, but the record does not show either its appearance or its default for not appearing. Such omission in the record is not relied upon by any party, and so will not be further noticed.

A jury was waived, and the court made findings of fact to the effect that there were unpaid claims as above recited, and findings of law to the effect that supplies consumed or used up by the contractor in the progress of the work were within the security contemplated by the bond, but that materials which became a part of the permanent equipment of the contractor and survived the completion of the work were not secured. Under this classification, the claims of plaintiff and eight interveners were allowed, in amounts aggregating about $28,000; and since the penalty of the bond was only 90 per cent. of the liability, each claimant was given a judgment for 90 per cent. of his allowed claim. This judgment took the form of a single entry, giving the name of each successful claimant, and reciting the 90 per cent. allowed to him, forming a total of $25,000, and adjudging that the United States, for the use and benefit of the claimants whose claims had been allowed, recover from the contractor and Surety Company $25,000 for its damages, and also recover the costs of each intervener. To review this judgment, the Surety Company brought this writ of error, alleging as errors that a court of law had no jurisdiction, because the statutory proceeding could be only in equity, and that the conclusion of law as to the liability to each successful claimant was erroneous. The sufficiency of the assignments will be further mentioned.

J. M. Garfield and Tolles, Hogsett, Ginn & Morley, all of Cleveland, Ohio, for plaintiff in error.

J. A. Cline, of Cleveland, Ohio, E. S. B. Sutton, of Sault Ste. Marie, Mich., B. H. Davis, Smith, Taft, Arter & Smith and Thompson, Hine & Flory, all of Cleveland, Ohio, and John W. Shine, of Sault Ste. Marie, Mich., for defendants in error.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

DENISON, Circuit Judge (after stating the facts as above).   [1] We pass by, without deciding, certain considerations affecting the right of the Surety Company to insist that a court of equity had exclusive jurisdiction, and assume that it had—and has—the full right to be heard on that question. Its contention is fully supported by the opinion of the Circuit Court of Appeals of the Second Circuit in Illinois Surety Co. v. United States, 212 Fed. 136, 129 C. C. A. 584, filed since the hearing of this case below. The contrary result has been

reached in the Seventh Circuit. Illinois Surety Co. v. United States, 226 Fed. 653, 664, —— C. C. A. ——. In the present case the bond is not sufficient to pay all the claims, and if, upon a writ of error attacking only certain claims, they are set aside, whereby the fund becomes sufficient to pay all, the other claimants who have not assigned error can get no benefit, according to the common-law rule affecting several judgments. In such a case the defendant surety might go free of part of its liability; and so there is direct force in the argument that a court of equity is the appropriate tribunal, and that therefore it will be presumed that Congress intended to put the jurisdiction there; yet, even since the amendment of the statute, so many courts—and the Supreme Court so many times[1]—have assumed that there was jurisdiction in the law court that we are reluctant to consider all these decisions inadvertent. It is enough to turn the scale when we observe, as was done in the Seventh Circuit, that, by the enactment of June, 1915, section 274a of the Judicial Code—and which enactment applies to pending cases—the only effect of holding in this case that the true jurisdiction was in equity, would be to send the case back to be transferred to the equity side and heard over again by the same judge upon probably the same proofs. Upon the whole we are better satisfied to say that the court below had jurisdiction.

[2] The statute involved has been many times considered, but the Supreme Court has never had occasion to declare broadly the meaning of "labor and materials." The standard lien statutes with reference to buildings, in force, probably, in every state, contemplate materials and labor which directly enter into the structure itself. We are not aware of any decisions extending these state statutes so as to reach and create liens for labor or materials which contribute to the construction so indirectly as do the supplies consumed by the contractor in operating his plant. Of course, where the statute, by its words or by judicial interpretation, gives a lien for labor or materials furnished to subcontractors, it carries us one step away from the structure itself; but this does not necessarily mean more than that the rule of direct contribution is to be applied to the work of the subcontractors.

The language of the present federal statute does not seem to be materially different from the typical state lien statute. There is a distinction between the original and the amended act. The act of 1894 directed that the bond given to the United States to secure the completion of the contract should have "the additional obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them labor or materials in the prosecution of the work," and further specified that suit might be brought and recovery had upon this bond by any person who had supplied "labor or materials for the prosecution of such work." When the statute was amended in 1905, there was no change in the language fixing the condition of the bond, but it was specified that recovery thereon could be

[1] Mankin v. Ludowici Co., 215 U. S. 533; 30 Sup. Ct. 174, 54 L. Ed. 315; United States v. Construction Co., 222 U. S. 199, 32 Sup. Ct. 44, 56 L. Ed. 163; Texas Co. v. McCord, 233 U. S. 157, 34 Sup. Ct. 550, 58 L. Ed. 893.

had by the person who had "furnished labor or materials used in the construction or repair" of the work. The substitution of this language, which adopted the usual phraseology of the lien statutes, in the place of the former more general reference to "materials for the prosecution of the work," is not to be overlooked, and at least has a tendency to bring this statute into harmony with the lien statutes of the states. Some of the decisions, even since the amendment to the statute, speak as if it contained only the provisions fixing the form of the bond, and reached all persons "supplying the contractor with labor and materials in the prosecution of the work," regardless of whether these things were "used in the construction"; but it is obvious that the two clauses must be read together, and that the provision which gives a right to an intervener only in case he has furnished labor and materials "used in the construction or repair" must receive its due force in interpreting the statute as a whole.

The Supreme Court has repeatedly declared that the bond provided for by this statute is a substitute for the lien of the mechanic's lien laws (Guaranty Co. v. Pressed Brick Co., 191 U. S. 416, 425, 24 Sup. Ct. 142, 48 L. Ed. 242; Hill v. Surety Co., 200 U. S. 197, 203, 26 Sup. Ct. 168, 50 L. Ed. 437; United States v. Ansonia Co., 218 U. S. 452, 471, 31 Sup. Ct. 49, 54 L. Ed. 1107; Title Co. v. Crane Co., 219 U. S. 24, 32, 31 Sup. Ct. 140, 55 L. Ed. 72; Equitable Co. v. United States, 234 U. S. 448, 455, 34 Sup. Ct. 803, 58 L. Ed. 1394); and this declaration of purpose at least suggests that the scope as well as the purpose may be discerned from comparison with the state statutes. The Supreme Court in the Pressed Brick Company Case extended the protection of the statute to subcontractors, in the Hill Case to materials furnished to a subcontractor, and in the Equitable Company Case, to a contract which had been somewhat changed after the surety's undertaking was made. In each of these cases there is a statement or intimation that the statute is to be construed liberally to accomplish its purpose, rather than strictly; but in each case the labor or material involved was of the class which entered directly into the work, and no one of these cases decides whether or not this liberality of construction will avail to reach classes of materials not commonly thought within state statutes.[2]

The subject of what specific materials are included we find touched upon by that court in only two cases, Title Co. v. Crane, supra, and United States, etc., Co. v. Bartlett, 231 U. S. 237, 34 Sup. Ct. 88, 58 L. Ed. 200. In the former case, certain claims for cartage and towage are approved as leading to liability under the bond. Page 34 of 219 U. S., page 140 of 31 Sup. Ct., 55 L. Ed. 72. The contract related to building a boat; the towage and cartage claims were, apparently, for hauling some materials. The facts show that they could not have been for

---

[2] The present force of Judge Putnam's comment in American Co. v. Lawrenceville Co. (C. C.) 110 Fed. 717, 719, to the effect that this statute should not be limited, like the lien statutes, to materials added to the value of the structure, may be somewhat lessened because it had reference to the original act, and because it was written before the Supreme Court had so often declared that the bond was a substitute for the liens.

labor, and so they must have been for materials. If we seek to apply the word "furnished" found in the statute, it would seem that the materials delivered at the work, through hauling or towing done by a carrier, were furnished jointly by the vendor and the carrier, and that the value of the transportation entered into and became a part of the value of the delivered material.[3] The case is, therefore, not necessarily inconsistent with the idea that the "materials" contemplated by the statute are those commonly so considered under the lien statutes. The case also allows a claim for patterns furnished to his molding department for the contractor who was building the marine engine which was a part of the boat. This pattern claim seems to be for labor rather than for materials. The engine builder, normally, makes patterns, makes molds, pours the castings, and machines them. All these things are done by the labor of his employés. If he gets some one else to make the patterns for him, their price is none the less part of the labor cost of producing the engine. The value of the raw material in patterns is negligible; and so it could not be assumed that they had any value for preservation to be used again, in the sense that they would become or might become a part of the contractor's outfit for other use. That this claim was regarded by the Supreme Court as for labor is apparent by the analogy stated between those who make patterns and those who erect scaffolding.

In the other case (United States, etc., Co. v. Bartlett) the contractors were to build a breakwater. They owned a quarry, and, to perform their contracts must open their quarry, get out the stone, transport it, and dump it in the water. There could have been here no question of furnishing materials to the contractors, for they owned the materials from the beginning. The question involved was the labor cost of quarrying and hauling the materials. The court held the whole of this was labor performed on the contract. It did not appear that the quarry, so far as stripped, remained of any value for future operation; and it is a proper inference that the work of stripping was performed on this contract just as much as the work of quarrying. The case seems clearly to show an instance of labor furnished directly in the construction of the work.

The decisions of courts other than the Supreme Court, and which are chiefly relied upon to extend the benefit of the bond to the "materials" now involved, are the so-called powder cases and coal cases (e. g., Powder Co. v. Greenwich Co., 183 N. Y. 306, 76 N. E. 153, 2 L. R. A. [N. S.] 288, 111 Am. St. Rep. 751, 5 Ann. Cas. 443; City Trust Co. v. United States [C. C. A. 2d Cir.] 147 Fed. 155, 77 C. C. A. 397). In the former, blasting powder, used in making excavations, has been held to give a liability under the bond. These powder cases stand on

---

[3] "Ordinarily the contractor for the material delivers the same, and includes the expense of the hauling in the price of the material. No objection, so far as we are aware, has ever been made to thus including the expense of the hauling and the price of the material. If it may be so included, and lien made to cover the same, why may not the cartman make a separate contract for hauling, and acquire a valid lien therefor?" Kehoe v. Hansen, 8 S. D. 198, 200, 65 N. W. 1075, 1076, 59 Am. St. Rep. 759.

reasoning peculiar to themselves. The powder, or similar explosive, is a direct substitute for manual labor, and it is expended or used directly and immediately on the construction work. This statute, like the lien statutes, must extend to excavating as well as to erecting, and unless powder may be considered materials used in that work, there would often be nothing to which the name "materials" could be applied.

The coal cases are one step further away. The powder directly shatters the rock. The coal serves to carry away the broken rock, but does so indirectly, through the intervention of the boiler, which makes the steam, which operates the engine, which lifts the dredge bucket. The powder is material used in the work; the coal is material the use of which contributes to the work.[4] However, it is not necessary to determine whether the coal cases are rightly decided. Some of the claims here allowed were for coal, and error was assigned on such allowance; but the briefs show that the intention was to raise only subordinate questions, and the general rightfulness of the allowance for coal is not questioned. We refer to these cases only because we must know whether they rest upon principles which require allowances of the supplies involved in this case; and since this case may be well distinguished from them, their correctness need not be determined.

The questions saved for this review, interpreting the assignments by the brief, pertain to claims which may be divided into three classes: (1) Those for groceries and provisions for the men; (2) those for machines or appliances of such a character as to become a part of the contractor's quasi permanent outfit, and as not to be used up or worn out on this job, unless they happened to be; and (3) those for machine or miscellaneous repairs or supplies of a more temporary character.

[3] The Brogan claim was for groceries furnished to the contractor's boarding house. We cannot attach any importance to the fact that the character of the country where this work was done made it necessary for the contractor to board its men on the job—in other words, compelled it to give them their board as a part of their pay for their work. Even if there may be distinctions between one who furnishes food consumed by the men in their contractor's boarding house and food consumed by the same men in an outside boarding house, it is not seen how it can be of any importance whether the men agree to board at the contractor's place, because it is the only one, or do so for some other reason; nor can there one rule in a city and another in a wilderness. The provisions, in one case as in the other, either are or are not "labor" or "materials" used in the construction of the work.

Counsel agree that in no case under this statute has the liability been extended to provisions, and that in the cases decided under the state lien statutes such liability has been denied (Perrault v. Shaw,

---

[4] The leading federal coal case, City Trust Co. v. United States, supra, arose under the act of 1894, unamended; and even under the original act the Court of Appeals of the District of Columbia reached the opposite conclusion regarding coal. United States v. City Trust Co., 23 App. D. C. 153.

69 N. H. 180, 38 Atl. 724, 76 Am. St. Rep. 160; Carson v. Shelton, 128 Ky. 248, 107 S. W. 793, 15 L. R. A. [N. S.] 509; Luttrell v. Knoxville Co., 119 Tenn. 492, 519, 105 S. W. 565, 123 Am. St. Rep. 737;[5] Dudley v. Toledo Co., 65 Mich. 655, 32 N. W. 884; Pennsylvania Co. v. Mehaffy, 75 Ohio St. 432, 80 N. E. 177, 116 Am. St. Rep. 746, 9 Ann. Cas. 305); but it is said they stand on the same basis as the coal for the engine, as they provide the energy which makes the machine—in this case, the human machine—do the work. The District Court, while regarding the question as very close, thought this final step in the reasoning could not be avoided. We find a sufficient distinction in the difference between labor and materials. Coal has been allowed as a material; it is expended as a material; it never is and never can be transformed and merged into that labor which is the "labor performed," as distinguished from the "material furnished," for each of which the statute gives a right of recovery. The logic of the coal cases—regardless of its persuasiveness—is that the word "materials" in the statute should be thought to include coal, because the latent energy of the coal was developed into a mere substitute for that human labor which is expressly included in the law, and unless this energy thus put into the work is protected in this way it is not protected at all. On the other hand, the food for the men never contributes to the work, except after it is transmuted into the form of that labor which, as labor, is protected. It is not to be thought that the statute gives twice a claim for the one thing.

In this case the entire labor right has been satisfied. The contractor paid the men their wages and furnished them their board, and they have no claim. Money that he may have borrowed to pay part of their wages is, on this principle (though not in responsiveness to the name "materials") difficult to distinguish from the food he borrowed— bought on credit—to pay the balance of their wages; but such money loans are not lienable. 47 Cyc. 44. Nor, if a claim were to be allowed for food for the men, could we well refuse one for rent of their quarters, special clothing, free tobacco, or anything else which the contractor might have agreed to provide as part of their pay. Indeed, among the items allowed on this claim, we find soap and towels, bedding, matches, kitchen and table furniture, etc. These last-named items only illustrate that if, by vague equities, or by the supposed liberal policy of the statute, we are led away from the field of direct and immediate use in the construction, we find no place to stop short of what the Supreme Court of New Hampshire called "interminable litigation and confusion." Perrault v. Shaw, supra. We cannot believe that these provisions sold by Brogan constitute "labor furnished or materials used in the construction of the work," save in a sense so indirect and remote as not to be within the fair contemplation of the statute.

While the cases above cited from the state courts denying a lien to board or provision claims are not under the statute now involved, we do not see controlling distinctions, either in the state statutes cited

---

[5] This case reviews many decisions and carefully classifies many articles now involved. See 119 Tenn. 512–520, 105 S. W. 565 (123 Am. St. Rep. 737).

in these cases or in the reasoning of the decisions. In the federal courts the point has not been directly decided, but it has been twice argumentatively pointed out that board or provisions are not materials for construction work. In Giant Powder Co. v. Oregon Co. (C. C.) 42 Fed. 470, 475, 8 L. R. A. 700, Judge Deady says:

"The food furnished a contractor for his men may be said to be 'used' and 'consumed' in the construction of the road on which they work, but this only in a remote or consequential way or sense. The food does not enter directly into the structure and is not so used."

He then distinguishes between this remote use, for which there will be no lien, and the more direct use of powder in blasting, or of water in making mortar, or of lumber used in scaffolding, no one of which remains in the final structure, but each of which is so directly used as to support a lien.

In United States v. Kimpland (C. C.) 93 Fed. 403, Judge Thomas was considering this statute in its 1894 form, and he said (page 406):

"Is the board, which the contractors have agreed conditionally to pay out of the men's wages, labor or materials supplied in the prosecution of the work? * * * It is considered that the word 'labor,' as used in the statute, does not admit of such remote and indirect equivalents, but requires the sureties to insure the payment for the visible material that was furnished for direct use and incorporation in the work. * * * Thereby the sureties had a clear conception of the limits of their liability. They were not concerned to see to it * * * that persons who furnished stores or food or lodging to the workmen, under an agreement by the contractor to pay for the same out of the wages due those benefited, should be paid. The contractor was under no such primary duty to the United States. His duty as a contractor, and as regards the sureties, was to pay the laborers their wages, and allow them to buy their board and clothing where they would."

United States, etc., Co. v. Bartlett, supra, is clearly a case where a claim was allowed for labor upon the theory that the unpaid wages of the laborers had been assigned to the claimant (see Justice Day's comment on page 243 of 231 U. S., 34 Sup. Ct. 88, 58 L. Ed. 200); and so, although the original claim was for board, the claim allowed was for labor, and the case has no application here. Lybrandt v. Eberly, 36 Pa. 347, and Bangs v. Berg, 82 Iowa, 350, 48 N. W. 90, are instances where liens were allowed for that agreed price of labor or materials and board which had been made a part of the contract price. In Kollock v. Parcher, 52 Wis. 393, 9 N. W. 67, the statute was express.

[4] The second class of items here involved may be typified by the "Rand drills." As a matter of common knowledge, such drilling machines are portable engines operated by suitable power, and intended to be used in one location after another until they are worn out. Their life depends upon the care given to them. It was found as a fact as to these machines that, because they had been either so much used or so badly used upon this work or because the business was to be liquidated, the receiver considered them not worth moving and they were abandoned. If the bond is to extend at all to machines, tools, and appliances used upon the work, their inclusion must be determined by their inherent character, and not by the length of time for which or the manner in which they happen to be used. Such drilling

machines become a part of the permanent outfit of the contractor. True, they might wear out sooner than a dredge, or a crane, or a hoisting engine; but they might outlive any of these things. In our judgment, they cannot be regarded as materials used in the construction of the work. Of the same class are many other things found among items allowed. Rope in large quantities, wire cable, anchor chains, etc., are clearly normally a part of the permanent or quasi permanent outfit of the contractor. They obviously would outlast any short piece of work; and the proper name to give them must be fixed by the nature of the materials, and not by the length of the job. If, in fact, any of these things, like rope, was intended for current consumption in the direct doing of the work, it does not so appear upon this record. Things of this class are not normally intended for specific use and exhaustion upon the work where they are first sent. They are not materials used in the work; they are facilities for doing that work and any other work to which they may be applied.

[5, 6] The third class consists of miscellaneous supplies and repairs for the contractor's plant. This plant consisted of a dredge and its machinery, a drill boat and its machinery, two tender tugs, and the boarding house. So far as these supplies may have been specifically intended for current consumption directly on the work, they are allowable, like the blasting powder, and like the lumber actually consumed in scaffolding or in concrete forms. Of this character would be the drills used in the drilling machines, or the material therefor. The record does not show certainly the amount of these articles, but steel generally described may have been for this purpose. These drills are made to be used up currently. Their life is a matter of days, if not of hours. The contractor buys only his current needs on the particular job. The drills are used up in direct and immediate contact with the rock, the removal of which is the "construction of the work," and we are satisfied, by analogy to the powder cases, to regard such drills as materials under the statute.

The great part, however, of the items allowed as supplies and repairs, were for the ordinary and current repairs on the machinery and for miscellaneous articles used in the maintenance and operation of the boats and dredges. The articles for outfitting the boarding house (the soap, etc., above mentioned) really belong in the same class. These supply items are of infinite variety, as would be expected when we see that they are not for use directly on the work, but are for the maintenance of buildings, boats, and machinery in suitable condition for living in the buildings or on the boats, navigating and operating the boats, and operating the machinery. As a class we think they are beyond the statute. We may specify bolts and nuts, valves, cylinder heads, electric wire, lanterns, wrenches, files, electric light globes, divers' overalls, waste, oakum, packing, grindstones, kerosene, paints, etc. We even find among the items to which specific attention apparently was not called, but which were allowed against the general objection, two typewriter ribbons, five lengths of stovepipe, and three rat traps. It cannot be denied that even these last items may be necessary supplies for the proper keeping of the boats or buildings in

habitable condition, but we cannot think they are "materials used" in the deepening of St. Mary's river; and this not because they are extreme and striking instances, but because they typify things which are either additions to the contractor's working outfit or are intended to maintain the existing outfit in as good order as possible against the wear and depreciation which would otherwise accrue. We approve generally and apply the rules of separation of items as stated by Judge Webb in United States v. Morgan (C. C.) 111 Fed. 474, 488.

It results that the judgments in favor of the Pattison Supply Company, the Soo Hardware Company, the George Worthington Company, the Upson-Walton Company, and J. P. Brogan must be reversed. As to the Brogan claim, no new trial will be awarded, since, upon the undisputed facts, there can be no recovery. In each of the other claims just named, the claimant may be able to furnish proof which, under our view of the statute, will show a liability as to some of the items. As to each of these claims there will be a new trial—unless counsel, before the mandate goes down, file a stipulation fixing the amounts recoverable under the rules we have indicated. In that event the mandate will direct judgments accordingly, and our action will then be final and subject to immediate review. See In re Martin (C. C. A. 6th Cir.) 201 Fed. 31, 38, 119 C. C. A. 363.

[7] We see no practical way of considering the judgment below as one at law and still subject to partial review, except to treat it as 11 separate judgments in favor of or against 11 separate claims, which for convenience were united in one group proceeding, one hearing, and one judgment, with the same force and effect as if they were consolidated actions. Diggs v. Railroad (C. C. A. 6th Cir.) 156 Fed. 564, 84 C. C. A. 330, 14 L. R. A. (N. S.) 1029. No one of the powder or coal claimants complained of the cutting down of its claim to 90 per cent. but each accepted its judgment for that amount; and we affirm the judgments so rendered. There seems to be no insuperable difficulty in allowing part of the judgments, to stand, although they are united in one entry with the judgments which are reversed.

The plaintiff in error will recover its costs against the five defendants in error whose judgments are reversed. The four defendants in error whose judgments are affirmed will collectively recover costs against plaintiff in error.