# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS
## THE CIRCUIT AND DISTRICT COURTS
## AND THE COMMERCE COURT

---

### SKUD v. TILLINGHAST.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1912.)

#### No. 2,144.

1. PLEDGES (§ 55*)—ACTION ON PRINCIPAL CLAIM—RIGHTS OF PLEDGEE.

A pledgee in possession of the pledge and entitled to retain the same until his claim is paid need not, as between himself and the pledgor, resort as a general rule to the pledge before suing on the principal claim, though he may be compelled to release the pledge when his claim is satisfied.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 140–151; Dec. Dig. § 55.*]

2. PLEDGES (§ 44*)—CONVERSION OF PLEDGE BY PLEDGEE—EFFECT.

A pledgee who converts the pledge thereby in effect to the extent of its value discharges the debt, and the same result follows where the pledgee through his fault fails to preserve the pledge.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 103–107; Dec. Dig. § 44.*]

3. BANKS AND BANKING (§ 287*)—NATIONAL BANKS—RECEIVERSHIP—RIGHTS OF RECEIVER.

A receiver of an insolvent national bank stands in the place of the bank, and he may not appropriate to the use of the bank or its creditors any seeming asset that in equity and good conscience belongs to another, or ought not to be enforced against him.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1127; Dec. Dig. § 287.*]

4. PRINCIPAL AND AGENT (§ 178*)—KNOWLEDGE OF AGENT—KNOWLEDGE IMPUTABLE TO PRINCIPAL.

The rule that a principal is chargeable with the knowledge of his agent does not apply where the agent is hostile in interest to the principal in a transaction and acts outside the scope of his agency, and his act is not binding on the principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 680–684; Dec. Dig. § 178.*]

5. BANKS AND BANKING (§ 262*)—EXECUTION OF ACCOMMODATION NOTES FOR OFFICERS OF BANK—KNOWLEDGE OF OFFICERS IMPUTABLE TO BANK.

A maker of a note for the accommodation of the cashier of a bank re-

---

fused to sign it until collateral securities were attached to it, and a marginal memorandum made on it. The note and collaterals were obtained to secure the bank for a debt due from the cashier. The president of the bank induced the maker to execute the note to be secured by the collaterals, and the note and collaterals attached were turned over to the cashier or president for the bank. The maker acted in good faith. The collaterals were subsequently abstracted from the bank by the cashier. *Held,* that the president's interest in the transaction resulting in the execution of the note was not as a matter of law adverse to the bank, and the bank was liable to the maker for the loss of the collaterals on the jury finding that his interest in the transaction was not adverse to the bank so as to make the knowledge of the president imputable to the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

6. TRIAL (§ 178*)—DIRECTION OF VERDICT—WEIGHT OF EVIDENCE.
The court on a motion to direct a verdict cannot weigh the evidence.
[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. § 178.*]

7. BANKS AND BANKING (§ 262*)—RECEPTION OF ACCOMMODATION NOTE SECURED BY COLLATERALS — ABSTRACTION OF COLLATERALS—LIABILITY OF BANK.
A maker of a note for the accommodation of the cashier of a bank signed it on condition that collaterals should be attached to it. The note and collaterals attached were delivered to the bank. The collaterals were subsequently abstracted by the cashier, who at the time was the common agent of the bank and the maker. *Held* that, since the bank could not receive the benefit of the note without bearing the burden of the knowledge of the officers of the bank that the note was secured by the collaterals attached thereto, it was liable for the loss of the collaterals.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1001–1006; Dec. Dig. § 262.*]

8. BANKS AND BANKING (§ 260*)—RECEPTION OF ACCOMMODATION NOTE SECURED BY COLLATERALS — ABSTRACTION OF COLLATERALS — LIABILITY OF BANK.
A bank which received a note executed by a third person for the accommodation of the cashier who was indebted to the bank, and who pledged collaterals attached to the note to secure it, must be deemed to have contracted to keep the pledged securities for the benefit of the maker, and its failure to do so is a breach of contract out of which the note grew.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 977, 978, 983, 984, 986½–990; Dec. Dig. § 260.*]

9. BANKS AND BANKING (§ 287*)—ACTIONS—RECOUPMENT.
The failure of a bank receiving a note executed by a third person for the accommodation of its cashier who pledged securities attached to the note to secure it to protect the pledged securities as it contracted to do is a breach of the contract out of which the note grew, and furnishes a claim arising under that contract available to the third person by way of recoupment when sued on the note by the receiver of the bank, and the third person's remedy is not confined to equity.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1127; Dec. Dig. § 287.*]

In Error to the Circuit Court of the United States for the Western District of Michigan.

Action by Philip Tillinghast, receiver of the First National Bank of Ironwood, Mich., against Herman Skud. There was a judgment

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for plaintiff, and defendant brings error.   Reversed, and new trial awarded.

The judgment in this case was entered upon a directed verdict, the direction having been given at the close of all the evidence, and the failure to submit the case to the jury is distinctly assigned as error.  The basis of the suit is a promissory note.  The form of the note as contained in the notice given under the money counts of the declaration and as received in evidence is that of an ordinary demand note, bearing date October 1, 1908, payable to the order of the First National Bank of Ironwood, Mich., for $2,500, with interest at 6 per cent. per annum, and signed by Skud.  The defendant, Skud, pleaded the general issue, and in the detailed notice and an affidavit presented thereunder charged material alteration of the note, and denied that the note sued on was executed by him.  The charge is that, when the note was executed and delivered, it contained on its left margin these figures and words, "(200) Butte-Balaklava (100) Shattuck," and that there was attached to the note certificates representing 200 shares of the capital stock of the Butte-Balaklava Copper Company, a corporation of Arizona, and 100 shares of the capital stock of the Shattuck-Arizona Copper Company, a corporation of Minnesota, but that after its delivery and prior to the commencement of this suit, without Skud's knowledge or consent, the note was altered by cutting off the figures and words mentioned and removing the certificates of stock.  The value of the stock seems to be equal to, if not in excess of, the amount of the note.  Skud gave further notice that upon the trial he would recoup and set off as against plaintiff's cause of action a claim for damages in the sum of $3,000, or so much thereof as would be sufficient, arising and growing out of the alteration of the instrument and failure safely to keep the original note and pledged securities, which in substance and effect represented the transaction into which the bank, through its president and cashier, and Skud entered.

The president, Jahn, and the cashier, Larson, had a controlling interest in the bank, and seem, in fact, to have been the active managers of the bank's entire business.  Larson requested Skud to sign a note for him for $2,500, and Skud refused.  Larson told him later that he would secure him by the stock before mentioned; and Skud upon conversing with Jahn was induced to sign the note in the presence of Jahn and Larson, and to leave it with either Jahn or with Jahn and Larson, but not until on Skud's demand the figures and words before mentioned had been entered in typewriting on the margin and the certificates representing the stock had been attached to the note by pinning the certificates thereto or fastening them to it by rubber bands.  The note thus secured was given for Larson's accommodation, and to take the place of money that Larson then owed the bank.  No question is made as to the good faith of Skud in this transaction, nor is it claimed that he ever received any of the money.  Skud testifies that Larson threatened to call an unmatured loan of his unless he would sign the note; but Skud at once paid the substantial part of his loan, and seems to have been influenced at last to sign the note by the memorandum entered on its margin, the securities attached (which he regarded as having greater value than the face of the note), and the request of Jahn.  The evidence clearly shows that the marginal figures and words of the note were clipped off, and the certificates of stock removed from the note after they were turned over as before stated.

Although the note bears date of October 1st, it was not executed until some time between the 8th and 15th of the month; and on November 20th following the bank was examined.  The examiner testifies that he made a list of the notes, and that this note appears as an unsecured demand, though he could not remember the particular paper.  Another examination was made June 12, 1909, and on the 21st the bank was closed.  The receiver took possession on the 24th.  There is testimony that the note was found in its present condition at the later examination, and also at the time the bank was closed.  Larson testifies that the memorandum was on the note and the stock in possession of the bank when he left.  Larson was displaced as cashier on June 17, 1909, and he with Jahn and Beddow, assistant cashier, were charged with embezzling the assets and collateral securities of the bank, and making false entries in its books.  Larson plead-

ed guilty, and was sentenced to imprisonment. Jahn committed suicide. The receiver testifies that securities were converted by Larson, but that the records do not indicate any conversion by Jahn. Skud, in substance, testified without apparent contradiction that in answer to the receiver's request of him to pay the note he said ·that he would if it were presented in its original condition with the collaterals attached.

Julius J. Patek, for plaintiff in error.

C. B. Wilby (Philip Tillinghast, of counsel), for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

WARRINGTON, Circuit Judge (after stating the facts as above). The record requires us to consider the proposition, in substance urged on behalf of the receiver, that the action can be sustained on the promissory note in its present form, without reference alike to the receiver's inability to produce the abstracted securities and his refusal to account for any portion of their value upon payment of either the note or judgment, and also without recognizing the defense of alleged wrongful conversion of the pledged securities and the resulting damages.

[1] It must be conceded that, as a general rule, as between a pledgor of his own securities and the pledgee, the latter is not bound to resort to the collaterals before suing upon his principal claim, though he may be compelled to release or reassign the securities when his claim is satisfied. This rule, of course, proceeds upon the theory that the pledgee is in possession of the collaterals, and is entitled to retain them until his claim is paid.

[2] However, when the pledgee has converted the pledge, he has to the extent of its value in effect discharged the debt; and the same result must follow where the pledgee has through fault of his failed to preserve the pledge. The contention is that no rule of this character can be applied in this case, because the note in its original form and the securities were not delivered to the bank, and, further, the securities did not belong to Skud. The reasons assigned for nondelivery are that both Jahn (the president) and Larson (the cashier) were in their dealings with Skud engaged in the commission of a fraud upon the bank, and consequently that their knowledge was not imputable to the bank, and their acts were not binding upon it. It is not claimed that Skud was cognizant of the alleged fraud, or that he derived any benefit from the transaction. The claim is that he gave the note for the accommodation of Larson, and that, since the securities belonged to Larson, Skud must look alone to him for either their return or their value. This gives no effect to the refusal of Skud to sign the note unless and until the marginal memorandum was made on it and the securities were attached; nor to the evidence that the note and collaterals were obtained to secure the bank upon a debt then owing to it by Larson. The position the receiver is thus forced to assume is that he may disregard the benefit that would through the securities have inured to Skud, and still claim the advantage that inured to the bank through Skud's promise alone. It is to be observed that Skud is not suing the bank or its receiver for the stock; nor is it

suggested that the transaction (apart from the question of fraud of the bank's officers) was not within the authority of the president and cashier. Skud is urging by way of defense that the receiver cannot through affirmative action claim the benefit of his (Skud's) promise, and at the same time deny that the bank was affected by the knowledge of its president and cashier concerning the eliminated memorandum and securities on the faith of which the promise was obtained. It results that, in order to sustain the directed verdict, the receiver must show that the evidence justifies the conclusion, as matter of law, that the note in its present form was alone delivered to the bank, and that Skud must be restricted to the idle ceremony of pursuing Larson for either the eliminated stock or its value.

We are thus brought to the inquiry whether the evidence presents a question of fact for the jury, or merely a question of law, touching delivery of the instrument.

[3] In considering this inquiry, it is to be observed, in the first place, that in Peterson v. Tillinghast, 192 Fed. 287, 290, 112 C. C. A. 545, we held, following the decision in Rankin v. City Nat. Bank, 208 U. S. 541, 546, 28 Sup. Ct. 346, 52 L. Ed. 610, that "the receiver stands no better than the bank." Fourth Street Bank v. Yardley, 165 U. S. 653, 17 Sup. Ct. 439, 41 L. Ed. 855. If it were necessary to state a reason for this, it is because a receiver cannot lawfully appropriate to the use of the bank or its creditors any seeming asset that in equity and good conscience belongs to another or ought not to be enforced against him. Fairfield v. Southport Nat. Bank, 80 Conn. 92, 106, 67 Atl. 471.

[4] Next, it is urged, in substance, that Larson and Jahn were as to this transaction hostile in interest to the bank and acting outside the scope of their agency, and so their knowledge was not imputable to the bank and their acts not binding upon it. This is one of the recognized exceptions to "the general rule that the principal is held to know all that his agent knows in any transaction in which the agent acts for him." American Nat. Bank v. Miller, 185 Fed. 338, 343, 107 C. C. A. 456 (C. C. A. 6th Cir.) ; Thomson-Houston Electric Co. v. Capitol Electric Co., 65 Fed. 343, 12 C. C. A. 643 (C. C. A. 6th Cir.) ; Melton v. Pensacola Bank & Trust Co., 190 Fed. 126, 137, 111 C. C. A. 166 (C. C. A. 6th Cir.).

[5] Is the exception so stated to the general rule applicable to this transaction, particularly to Jahn's part in it? It must be borne in mind as stated that Skud would not sign or deliver the note unless and until the words and figures were entered on the margin of the note and the certificates of stock attached; and it is hard to see how the one can be said to have been lawfully delivered to the bank, and not the other.

It is insisted as against Jahn that in his conversation with Skud which led up to the transaction in dispute Jahn used the plural pronoun "we" many times when alluding to matters such as a case which Larson had lost; to the reason why Larson did not wish to sell the stock; to their confidence in Skud; and to the time when they would take up the note, etc. We think it is rather a strained inference to deduce from

such use of the pronoun that Jahn was confessing to a fraud, not to say a crime, while stating to Skud reasons why he could safely sign the note. It is certain that Skud derived no such impression. True, Jahn was arrested later and charged with embezzling assets and collateral securities of the bank and making false entries in its books; true, also, Jahn committed suicide. We discover nothing in the record, however, that in terms tends to show that he embezzled assets or made false entries; and the receiver testified that the records do not show any conversion of collaterals by him. It must be remembered that the transaction now under consideration concerns Larson's past debt and Larson's stock that was turned over as collateral to secure that debt. How then can it be safely affirmed as matter of law that Jahn's interest in that transaction was adverse to the bank? When all the evidence is considered, we think it presents questions for submission to a jury.

[6] The court on the motion to direct could not weigh the evidence. Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 467, 477, 20 C. C. A. 596 (C. C. A. 6th Cir.). Furthermore, if the question were one simply of law, it is not at all clear that Jahn's interest should be regarded as adverse to the bank. In First Nat. Bank v. Sing Sing Gas Mfg. Co., 120 App. Div. 542, 104 N. Y. Supp. 1040, 1041, unanimously affirmed without opinion in 194 N. Y. 580, 88 N. E. 1119, it was held that the fact that one Noxon was plaintiff's cashier and also defendant's treasurer and an indorser of defendant's note in suit "did not disqualify him from receiving collateral in behalf of the bank, because his interest in that transaction was in no sense adverse to the bank." Further, Skud does not appear to have been dealing with Jahn as an individual, but as president of the bank. W. N. Bank v. Birch, 130 N. Y. 221, 228, 29 N. E. 127, 14 L. R. A. 211. If, under appropriate instructions, it should be found by a jury that Jahn did in truth receive the note and collaterals for the bank, the fact that the collaterals were subsequently abstracted from the bank could not affect the rights of Skud. Skud's authority to pledge the collaterals could not be seriously questioned, any more than could be his beneficial interest in them if he did pledge them. It is claimed that the collaterals were abstracted by Larson. If this be true, and the other facts just mentioned be also true, it is not a sufficient answer to say that Larson abstracted his own securities. This view overlooks alike the interest in them, which the bank obtained by the pledge (Casey v. Cavaroc, 96 U. S. 476, 24 L. Ed. 779) as well as Skud. In First Nat. Bank v. Sing Sing Gas Mfg. Co., supra, bonds were received as bank collaterals by the cashier, who afterwards sold them and used the proceeds to reduce his indebtedness to the plaintiff for moneys unlawfully appropriated by him. Of this it was said by the court (120 App. Div. 544, 104 N. Y. Supp. 1042):

"He had authority to receive them in behalf of the bank. He attempted to exercise that authority; and, when he afterward stole them, he stole from the bank, and not from his fellow indorsers."

See, also, W. N. Bank v. Birch, supra. In Ditty v. Dominion Nat. Bank, 75 Fed. 769, 771, 22 C. C. A. 376, 378, the principle just re-

ferred to seems to find approval of this court. Alluding to another decision which involved transactions conducted by a defaulting treasurer of two corporations, Judge Taft said:

"We do not see that the circumstance, in that case, that the treasurer stole the money, and, in this, that the president obtained it on the false representation that he was authorized to borrow it for his bank, makes any reasonable distinction between the two cases."

[7] The most that can be said in respect of abstraction of the stock by Larson is that he was at the time the common agent of the bank and Skud. The effort of the receiver is as stated to recover on Skud's promise, despite the knowledge of the bank's president and cashier touching the condition imposed by Skud as to the memorandum and securities. This ignores a principle settled both by this court and the Supreme Court. It was not open to the bank to receive the benefit of Skud's individual promise, through either its president or cashier, or both, without bearing the burden of the knowledge which those officials had when receiving the benefit. In Ditty v. Dominion Nat. Bank, supra, this court held that a bank, whose president had embezzled certain of its funds and replaced them with money borrowed by him on the bank's note, without the directors' knowledge, and then applied the money so borrowed to the bank's lawful debts, was affected with the knowledge of the president and liable to the bank from which the money was borrowed; Judge Taft saying (75 Fed. 771, 22 C. C. A. 377):

"Having received the benefit through an agent, it is affected with the burden of the notice which that agent had of its reception, and therefore it became liable for money had and received to its use from the Dominion National Bank. * * * So in this case the bank, having received the money through the agency of its president, could not retain it without assuming the burden of the president's knowledge as to how it came to be obtained."

See Aldrich v. Chemical National Bank, 176 U. S. 618, 633, 20 Sup. Ct. 498, 44 L. Ed. 611, where the Ditty Case was cited with approval; Atlantic Mills Co. v. Indian Orchard Mills, 147 Mass. 268, 274, 17 N. E. 496, 9 Am. St. Rep. 698; Fairfield v. Southport Nat. Bank, supra, 80 Conn. 103, 67 Atl. 471; Lowndes v. City National Bank, 82 Conn. 8, 13, 14, 72 Atl. 150, 22 L. R. A. (N. S.) 408; Merchants' Bank v. State Bank, 10 Wall. 604, 644, 645, 19 L. Ed. 1008; First Nat. Bank v. Bakken, 17 N. D. 224, 227, 116 N. W. 92.

Manifestly it can make no difference which party to an action invokes the principle of those decisions. If Skud had received the money mentioned in the note, he would have to pay it back. Since he did not receive it, neither the bank nor its receiver can claim the benefit of his promise without yielding to him the corresponding benefit of the stock. If this were not the law, it would result that the receiver alone could in effect rescind the contract with Skud so far as it would impose an obligation upon the bank and affirm it so far as it would operate to its advantage. Peninsular Bank v. Hanmer, 14 Mich. 207, 214.

[8] The only remaining question necessary to determine is whether upon the hypothesis that the note in its original form and the certificates of stock were delivered to the bank the defense urged by Skud can be entertained in this suit. We are disposed to believe that it can.

Upon this hypothesis the transaction embraced, at least it was connected with, the security, as well as the promise. Shaw v. Methodist Episcopal Society in Lowell, 8 Metc. (Mass.) 223, 226. Otherwise expressed, the bank impliedly contracted to keep the pledged securities for the benefit of Skud, and its failure so to do is a breach of the contract out of which the note in question grew, and thus furnishes a claim arising under that contract. ·

[9] It was held below that Skud's remedy is in equity; but that is not his only remedy. He may have any damages he has suffered through loss of the stock, applied in reduction of the indebtedness due upon his promise. If such a defense is not within the doctrine of set-off as it exists under the statute and the practice of Michigan, it seems clear that it is within the doctrine of recoupment under the statute of the state and the practice in that behalf. Its allowance would avoid circuity of action, not to say injustice. In McHardy v. Wadsworth (1860) 8 Mich. 349, 353, Judge Christiancy said:

"A defense, by way of recoupment, denies the validity of the plaintiff's cause of action to so large an amount as he claims. It is not an independent cross-claim, like a separate and distinct debt or item of account due from the plaintiff, but is confined to matters arising out of, or connected with, the contract or transaction which forms the basis of the plaintiff's action. It goes only in abatement or reduction of the plaintiff's claim, and can be used as a substitute for a cross-action only to the extent of the plaintiff's demand."

Again (8 Mich. 354):

"It prevents circuity of action, and accomplishes full justice to all the parties without the violation of any rule of law."

Although Judge Campbell dissented because of an imperfect notice and of a belief that it was not open to amendment, yet he said (8 Mich. 355):

"And I think the doctrine of recoupment, arising directly, as here, out of matters forming the consideration, should be permitted in like manner to apply."

In Platt v. Brand, 26 Mich. 173, 175, in speaking of recoupment, Judge Campbell said:

"The whole doctrine is one of the equitable outgrowths of the improvement of legal practice; and no obstacle should be thrown in the way of its encouragement. Our legislation has indicated this design by enlarging the defense and permitting defendants to recover damages beyond the plaintiff's claim. We do not feel disposed to accept any technical doctrines which would prevent its full efficacy, unless compelled by a weight of authority which we do not find here."

See, also, language of Judge Cooley in Chandler v. Childs, 42 Mich. 128, 130, 131, 3 N. W. 297, and of Judge Marston in Iron Cliffs Co. v. Gingrass, 42 Mich. 30, 31, 3 N. W. 238.

In Donnel v. Wyckoff, 49 N. J. Law, 48, 50, 7 Atl. 672, 673, it was held that in an action brought by a pledgee for the debt the defendant might set up the wrongful conversion of the pledge by way of defense, and be allowed its value as payment of the debt pro tanto; the court saying:

"The loan of the money and pledge of the stock as collateral security are parts of the same transaction, and the value of the property wrongfully con-

verted and the amount of the debt can both be as readily ascertained in the action by the pledgee for the debt, as in the action by the pledgor for the conversion of the pledge."

Again (49 N. J. Law, 51, 7 Atl. 673):

"To deprive the creditor of all remedy for his debt, because by inadvertence he has made an unlawful disposition of the pledge—it may be of less value than the debt—would be unjust. Equally unjust would it be to compel the debtor to pay the debt in full in the face of the wrongful disposition of the property pledged, and then put him to an action of trover against the same party, who may be insolvent and incapable of satisfying the judgment against him. The injustice that might be done to the pledgee in an action of trover for the wrongful conversion of the pledge—the debt for which it was pledged being unpaid—is obviated by allowing the amount of the debt in abatement of damages, on the theory that to that extent the property pledged has been applied to the pledgor's use. On the same principle the value of the pledge wrongfully converted may be treated as payment pro tanto, or in full in an action for the debt."

To the same effect: Rush v. First Nat. Bank, 71 Fed. 102, 104, 105, 17 C. C. A. 627 (C. C. A. 8th Cir.); Brown v. First Nat. Bank, 112 Fed. 901, 905, 50 C. C. A. 602, 56 L. R. A. 876 (C. C. A. 7th Cir.); Stuart v. Bigler's Estate, 98 Pa. 80, 84; Ocean Nat. Bank v. Fant, 50 N. Y. 474, 476; Frank & J. G. Jenkins, Jr., v. Conklin, 146 App. Div. 301, 130 N. Y. Supp. 779, 780. Other cases showing varying though kindred applications of the doctrine: Michigan Yacht & Power Co. v. Busch, 143 Fed. 929, 936, 75 C. C. A. 109 (C. C. A. 6th Cir.); Wm. Carraway & Sons v. Kentucky Refining Co., 163 Fed. 189, 192, 90 C. C. A. 59 (C. C. A. 6th Cir.); York Mfg. Co. v. Rothwell, 119 Fed. 144, 147. 56 C. C. A. 52 (C. C. A. 6th Cir.); Dushane v. Benedict, 120 U. S. 630, 648, 7 Sup. Ct. 696, 30 L. Ed. 810; Bank v. Smith, 144 Iowa, 203, 206, 122 N. W. 825. That Skud's remedy is not confined to equity finds further support in the analogous class of cases, which hold that a mortgagee may bring trover for conversion of the mortgaged property. Grove v. Wise, 39 Mich. 161; Hull v. Bernatz, 106 Mich. 551, 64 N. W. 473; Huellmantel v. Vinton, 112 Mich. 47, 70 N. W. 412; note to Worthington v. Hanna, 23 Mich. 530.

We are therefore constrained to hold that it was error to grant the motion to direct a verdict. We refrain from passing upon other questions presented.

The judgment below must be reversed, and a new trial awarded, with costs.