### KEAN et al. v. NATIONAL CITY BANK.

(Circuit Court of Appeals, Sixth Circuit. November 12, 1923.)

No. 3797.

I. **Trover and conversion** ⬅16—**Equitable title insufficient to maintain action for conversion.**

Where bonds were stolen, and sold to good-faith purchasers, a bank is not liable to original owners for conversion in cashing the purchase-money drafts, as the original owners have no more than an equitable title in the drafts, and an equitable title is insufficient to maintain an action for conversion.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Trover and conversion** ☞ 11—**Receipt of proceeds of sale by another insufficient to sustain action.**

The mere receipt of the proceeds derived from a sale by another of property which had been converted by him is not sufficient to maintain trover.

3. **Courts** ☞ 352—**Action for conversion held not to show apparent liability in equity, requiring transfer to equity side.**

Where bonds were stolen, and sold to good-faith purchasers, and trover was brought against the bank, cashing the purchase-money drafts, in the absence of notice to the bank, there is no apparent liability in equity, requiring the case to be transferred to the equity side, under Judicial Code, § 274a (Comp. St. § 1251a).

4. **Conspiracy** ☞ 9—**Trover and conversion** ☞ 11—**Bank, purchasing drafts given for stolen securities and having notice thereof, liable to owners.**

If a bank purchases drafts in bad faith, with notice of fact that they were given by good-faith purchasers of stolen securities, it is liable to original owners, either on the theory of a conversion or for participating in a conspiracy to defraud them.

5. **Banks and banking** ☞ 116(3)—**Notice to vice president, not purporting to act as agent, not imputed to bank.**

Though a vice president of a bank had notice that drafts were given by good-faith purchasers of stolen bonds, where he did not purport to act as agent of the bank, but had the drafts cashed as any other depositor could have done, notice will not be imputed to the bank.

6. **Principal and agent** ☞ 178(1)—**Generally, notice to agent notice to principal.**

Generally, a notice to an agent as to any transaction within the scope of his authority is considered as notice to principal.

7. **Principal and agent** ☞ 180—**Principal not charged with knowledge of agent, dealing at arm's length with principal.**

Where an agent is dealing at arm's length with his principal, as any stranger might deal, the principal is not charged with knowledge of the agent in respect to such a transaction.

8. **Banks and banking** ☞ 116(6)—**Knowledge of vice president, acting within scope of authority, imputed to bank, notwithstanding personal adverse interest.**

Where stolen negotiable bonds were sold by vice president, and the purchase money collected by drawing a draft in the name of the bank, *held,* that vice president did not purport to deal with the bank as a stranger, but purported to act and did act in his representative capacity, and within the scope of his authority as agent for the bank; hence any knowledge which he had concerning the bonds would be imputed to the bank, notwithstanding a personal fraudulent purpose on his part, and that he had temporary custody of the bonds prior to the transaction.

9. **Trial** ☞ 178—**In passing on motion to direct verdict, court cannot weigh evidence.**

Though a mere scintilla of evidence in support of plaintiff's case is insufficient to justify submission to the jury, in passing on a motion to direct a verdict, the court cannot weigh the evidence.

10. **Banks and banking** ☞ 228—**Extent of vice president's knowledge concerning stolen bonds sold by bank held for jury.**

In an action against a bank by original owners of stolen bonds, the extent to which the vice president, who consummated a sale of the bonds on bank's behalf, had knowledge of the character of the bonds, *held* for the jury.

11. **Bills and notes** ☞ 337—**Negligence or suspicion of defect in title insufficient to show bad faith.**

Suspicion of a defect in title, or even negligence in failing to make inquiry, will not charge an individual with bad faith, in the case of negotiable instruments.

☞ For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Trial ⊕→178—Evidence considered most favorable to party against whom motion to direct verdict is requested.**

On a motion to direct a verdict, the court should take that view of the evidence which is most favorable to the party against whom the instruction is asked.

**13. Bonds ⊕→130—Defense of bona fide purchaser held affirmative defense.**

In an action by original owners of stolen bonds, the defense of bona fide purchaser is an affirmative defense, and defendant has the burden of proving it.

### On Rehearing

**14. Appeal and error ⊕→1172(1)—Portion of single judgment cannot be affirmed.**

A portion of a single judgment at law cannot be affirmed, and other portions remanded for a new trial.

**15. Appeal and error ⊕→1172(2)—Some of distinct judgments grouped in one entry may be affirmed, and others reversed.**

Where cases separately commenced have been consolidated for trial, or several distinct judgments in favor of separate plaintiffs are for convenience grouped in one entry, the reviewing court can properly effect a severance, and affirm some and reverse others.

**16. Certiorari ⊕→16—Judgment granting or denying part of damages claimed, and contemplating further proceedings as to other damages, not final.**

Where three separate items of damages all arise and are claimed under one cause of action, there cannot be a final judgment granting or denying a part of the damages, and at the same time contemplating further proceedings in the suit to determine the liability as to the remainder of the damages.

In Error to the District Court of the United States for the Western District of Tennessee; J. W. Ross, Judge.

Action by Hamilton F. Kean and others against the National City Bank. Judgment for defendant, entered on a directed verdict, and plaintiffs bring error. Reversed and remanded for a new trial.

Petition for certiorari dismissed 44 Sup. Ct. 179, 68 L. Ed. ——

Wm. H. Fitzhugh, of Memphis, Tenn. (Carter, Ledyard & Milburn, of New York City, and Fitzhugh, Dixon & Osoinach, of Memphis, Tenn., on the brief), for plaintiffs in error.

A. L. Heiskell and T. K. Riddick, both of Memphis, Tenn. (A. W. Ketchum and Anderson & Heiskell, all of Memphis, Tenn., on the brief), for defendant in error.

Before DENISON and DONAHUE, Circuit Judges, and HICKENLOOPER, District Judge.

HICKENLOOPER, District Judge. The only question presented by the record is the alleged error of the court below in directing a verdict for the defendant at the close of plaintiffs' evidence. The plaintiffs in error were therefore plaintiffs below.

It appears from the evidence that in November, 1920, $466,000 par value of Liberty Bonds, the property of the plaintiffs, were stolen from an employé of the plaintiffs in the city of New York. The bonds involved in this case were part of those so stolen. Thereafter, in January, 1921, one H. Diggs Nolen, of the city of Memphis, Tenn., a depositor at the National City Bank of Memphis, defendant herein, and a

man of apparently bad reputation, called at the bank and stated that he desired to sell $100,000 of Liberty Bonds. He was told that the bank did not buy or sell bonds, and was referred to the Bank of Commerce & Trust Company, of Memphis, where a list of the bonds was left for investigation of title; but, no purchase being made, the bonds were then returned to Nolen. A request for a loan of $80,000 upon the bonds was also refused by the defendant. These transactions all took place on Saturday afternoon, January 15, 1921, during the absence of W. L. Huntley, Jr., the active vice president of the defendant bank.

On Monday, January 17th, Huntley returned to his duties and was at once cautioned by the president of the bank to have nothing to do with the bonds, should Nolen again offer them for sale. Shortly after this caution Huntley instructed the teller at the bank to prepare to cash a draft for between $80,000 and $90,000 with currency of large denomination, and shortly before the hour of closing Huntley presented to the teller a draft for $85,000 drawn by the Union & Planters' Bank & Trust Company, of Memphis, Tenn., on its New York correspondent, payable to the order of A. K. Tigrett & Co. and indorsed in blank by that firm and by Nolen. The teller, who was also an assistant cashier, cashed the draft for its face value, less $56.70 exchange charged by the bank. This draft was given in payment of the purchase price of bonds sold to the Union & Planters' Bank & Trust Company by Tigrett & Co., presumably for the account of Nolen, and the draft was cashed by Huntley, through the bank, for Nolen.

Nine days later, or on January 26th, Huntley procured a personal friend of his, one M. B. Joseph, to sell $65,000 par value of Liberty Bonds through Priddy & Williams, dealers in securities, cautioning Joseph not to disclose his (Huntley's) connection with the transaction, and telling him that the sale was made on behalf of a friend or client. These bonds Priddy & Williams likewise sold to the Union & Planters' Bank & Trust Company, and delivered to Joseph a draft payable to Joseph-Myers, Inc., for $54,000. Joseph then took this draft to Huntley, and indorsed it, "Joseph-Myers, Inc., by M. B. Joseph, Pres.," and Huntley immediately presented it to the teller, requesting that it be cashed, and the teller delivered to him the currency for the face of the draft, less exchange in the amount of $33.

On the same day, January 26, 1921, a sale of $10,000 par value of similar Liberty Bonds was made by Huntley to the firm of H. & B. Beer, of New Orleans, La., through F. Perkins, of Memphis, a correspondent of the purchaser. In completion of this sale Huntley drew the draft *of the defendant bank* upon H. & B. Beer, of New Orleans, for the purchase price, $9,202.76, attached $10,000 par value of Liberty Bonds thereto, and, the draft being to drawer's order, the indorsement of the bank was stamped upon the back. This draft Huntley presented to the teller, who then paid him the face value thereof in currency.

There were other facts presented, such as the attempt of Huntley to procure the sale of some of the bonds through one C. Samuel Black, and an introduction of Mr. Black as "Mr. Wood," and Black's subsequent refusal to have anything to do with the bonds, because of this, and because of the apparent secrecy or mystery surrounding the sale,

and the fact that the bonds sold by Joseph were sold for almost $4,000 less than the market price, with an apparent indifference upon Huntley's part as to details of price. Evidence was also introduced to the effect that H. Diggs Nolen was known generally in the city of Memphis as a man of bad reputation, a frequent violator of the Harrison narcotic law and the liquor laws, and an associate of men of ill repute. These and other incidental facts were introduced, and tended to prove that the circumstances surrounding the sales by Nolen were such as would place a reasonably prudent man upon inquiry, and, for the purposes of the motion involved, must be considered as having this effect.

As has been stated, it subsequently developed that the bonds sold in the foregoing transactions were part of the bonds originally stolen from the plaintiffs, and on January 11, 1922, the plaintiffs filed their declaration, seeking to recover from the defendant bank upon three grounds, namely: (1) That the defendant bank had participated in a conspiracy to defraud the plaintiffs by disposing of these stolen securities to innocent purchasers for value and without notice, after notice to the bank of plaintiffs' equities; (2) that the several drafts were purchased by the defendant bank mala fide and with notice; and (3) that in these transactions the bank converted the property of the plaintiffs to its use, and that plaintiffs might recover as for a conversion.

[1] Treating these several alleged grounds for recovery in their inverse order, and considering for the present only the first two drafts, the proceeds of bonds sold to good-faith purchasers, the third ground may be disposed of by the observation that the plaintiffs were not parties to the several bills of exchange, and under the most favorable view cannot be said to have had more than an equitable right in the drafts. We have been cited to no case, and we know of none, in which a mere equitable title has been held sufficient to sustain an action for conversion. If, under such circumstances, the party has a remedy, it is in a court of equity. Gilmore v. Watson, 23 Ga. 63; Farrow v. Wooley & Jordan, 149 Ala. 373, 377, 43 South. 144; Baker v. Seavey, 163 Mass. 522, 525, 40 N. E. 863, 47 Am. St. Rep. 475. The case of Newton v. Porter, 69 N. Y. 133, upon which plaintiff somewhat relies, is an action in equity, and the case at bar is clearly distinguishable from actions in trover, based upon a conversion of chattel property in its changed or improved form, or actions, as for conversion, against a former holder of a note or draft, who negotiates it to an innocent purchaser, contrary to the purposes for which it was placed in his custody. As was held in Metropolitan Elevated R. R. Co. v. Kneeland, 120 N. Y. 134, 24 N. E. 381, 8 L. R. A. 253, 17 Am. St. Rep. 619, the essential injury, common to all such latter class of cases, is the fraudulent imposition of liability upon a party to an instrument who would not otherwise have been liable. Here no such liability fraudulently imposed upon any party to the several bills is shown, or at least no previous party in any way complains of the imposition of such liability. There can be no liability at law, as for a conversion, either as to the draft for $85,000, or as to the one for $54,000.

[2, 3] The second contention of the plaintiffs, namely, that the bank purchased, and subsequently collected the proceeds of, these

drafts, in bad faith, with notice that they represented the purchase price of stolen bonds, would seem to be but another method of stating the contention of plaintiffs that the bank was liable as for conversion. Here, too, the remedy, if any, would seem to be in equity to follow such proceeds. The mere receipt of the proceeds derived from the sale by another of property which had been converted by him has never been held sufficient to sustain an action in trover. Leuthold v. Fairchild, 35 Minn. 99, 27 N. W. 503, 28 N. W. 218; Pierce v. O'Keefe, 11 Wis. 188; Walker v. First National Bank, 43 Or. 102, 72 Pac. 635. Nor, because of the absence of notice to be hereafter discussed, is there any such apparent liability in equity as would make it obligatory to transfer this cause to the equity side, under section 274a of the Judicial Code (Comp. St. § 1251a).

[4] Unless, therefore, the knowledge of, and notice to, the bank was such as to amount to a participation in a conspiracy to defraud, it would seem that the plaintiffs had no such interest in or to the drafts under consideration as would justify an action arising from their purchase. If, on the other hand, the bank purchased in bad faith, with notice of the fact that the drafts were given by good-faith purchasers of stolen securities, then there would be presented the first count of the plaintiffs' declaration, namely, participation in a conspiracy to defraud the plaintiffs, by disposing of their bonds to innocent purchasers, and by converting the drafts given in payment into currency, which it would be impossible to follow from hand to hand.

[5] This brings the court to the consideration of the matter chiefly argued on presentation of the case. Upon this charge of conspiracy, the liability of the bank—and, therefore, the correctness of the action of the court below—depends wholly upon the extent to which the bank is chargeable with the notice to, and the knowledge of Huntley, its vice president. It is thus contended by the plaintiffs that the bank is charged with notice of all that Huntley knew in connection with this transaction, and that if Huntley's connection with the conspiracy was proved, and if his knowledge, in its entirety, is notice to, and knowledge of, the bank, then the bank, by thus far participating in the fraudulent scheme of Huntley and his confederates, with notice thereof, would become liable.

[6] Still limiting our consideration of the question of such notice to the two drafts purchased or cashed by the defendant on January 17th and January 26th, unquestionably the general rule is that notice to the agent as to any transaction within the scope of his authority is to be considered as notice to the principal. This rule is most frequently said to be "based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty." The Distilled Spirits, 11 Wall. 367, 20 L. Ed. 167. There is, however, a well-established exception to the operation of this general rule, wherever the agent is shown to have been engaged in a private enterprise for the purpose of defrauding the principal or others. Then it is said that it cannot be presumed that the agent will communicate to the principal the facts which would con-

vict the agent of an attempt to deceive and defraud the principal. Thomson-Houston Electric Co. v. Capitol Electric Co., 65 Fed. 343, 12 C. C. A. 643 (C. C. A. 6).

But it is contended that there is no room for the application of the principle of this exception where the agent is the sole representative of both parties in the transaction, or, in other words, the "sole actor" on behalf of the principal. Then it is said that, although the agent has an interest in concealing his fraudulent knowledge, and presumably did not disclose it to his principal, yet since corporations can acquire knowledge only through their agents, and since the fraudulent agent was the sole representative of the corporation in the transaction, his knowledge must, of necessity, be considered that of the corporation as well as that of the other party interested in the transaction, viz. himself or his confederates in fraud. Otherwise, the corporation could not be held to have acquired any knowledge whatever as to the specific matter in which it has, through its agent, participated. See First National Bank v. Blake (C. C.) 60 Fed. 78; Cook v. American Tubing Co., 28 R. I. 41, 65 Atl. 641, 9 L. R. A. (N. S.) 193; First National Bank v. Burns, 88 Ohio St. 434, 103 N. E. 93, 49 L. R. A. (N. S.) 764; Smith v. Mercantile Bank, 132 Tenn. 147, 177 S. W. 72; Tatum v. Commercial Bank, 193 Ala. 120, 69 South. 508, L. R. A. 1916C, 767. ·

Another general theory advanced to sustain the proposition that the principal is charged with notice to the agent—

"finds the reason of the rule in the legal identity of the agent with the principal, during the continuance of the agency, in the fact that the agent, while keeping within the scope of his authority, is as to the matters embraced within it, for the time being the principal himself, or, at all events the alter ego of the principal, the principal's other self. * * * Whatever notice or knowledge, then, reaches the agent during this time and under these circumstances, in law reaches the principal, whether it does so in fact or not." 2 Mechem on Agency (2d Ed.) § 1805.

If this theory of the foundation of the general principle be adopted, instead of the theory of presumed disclosure by the agent to the employer, then the exception to the general rule would find its justification in the fact that as to the matter in question the agency had ceased to exist. Lilly v. Hamilton Bank, 178 Fed. 56, 102 C. C. A. 1, 29 L. R. A. (N. S.) 558. This would explain many of the apparent conflicts in the decided cases, for, clearly, if the agent steps aside from his representative capacity and deals with his principal as a stranger, or independent contractor, or as representing an undisclosed outside superseding principal who is thus stranger or contractor, the agency having for the time ceased to exist, the original principal is not charged with the knowledge of the agent as to matters as to which principal and agent are dealing adversely. Such matters are not within the scope of the agent's authority, and as to them the principles of the law of agency are inapplicable. Skud v. Tillinghast, 195 Fed. 1, 5, 115 C. C. A. 83 (C. C. A. 6). This distinction was also recognized in the case of Thomson-Houston Electric Co. v. Capitol Electric Co., supra, where Judge Taft (now Chief Justice) said:

"The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."

Under this view of the law, the question in the so-called "sole actor" cases, as well as in all others, would be whether the agent was acting within the scope of his authority in the particular transaction, or whether he had departed from such representative capacity and was either dealing directly with his principal or was inactive on behalf of his principal and in an adversary position. If the agent was active on behalf of the principal in accomplishing the result complained of, and if, in so doing, he was acting within the scope of his authority, this would be made the predicate of liability, whether he was fraudulent or not, or whether or not he had personal ends to subserve. If he had stepped aside from his capacity as agent, and was dealing adversely with his principal, it would make no difference whether he was the sole actor or not.

Thus, in the case of Thomson-Houston Electric Co. v. Capitol Electric Co., supra, the agent, although apparently a sole actor, had deserted his position as agent, and notice of his fraud was not imputed to the principal. The same may be said of the case of Bank of Overton v. Thompson, 118 Fed. 798, 56 C. C. A. 554 (C. C. A. 8), which also was a case where the cashier of the bank was the sole actor in a fraudulent transaction, but the "sole actor" doctrine was disapproved, and, because of the adverse fraudulent interest of the agent, notice was not imputed to the bank. In Bank v. Lovitt, 114 Mo. 519, 21 S. W. 825, the court said:

"An officer of a banking corporation has a perfect right to transact his own business at the bank of which he is an officer, and in such a transaction his interest is adverse to the bank, and he represents himself, and not the bank. The law is well settled that, when an officer of a corporation is dealing with it in his individual interest, the corporation is not chargeable with his uncommunicated knowledge of facts derogatory to his title to the property which is the subject of the transaction."

And this is perhaps the true basis of the court's decision in American National Bank v. Miller, 229 U. S. 517, 33 Sup. Ct. 883, 57 L. Ed. 1310, where it was not clear as to whether Plant, the president of the bank of deposit, was the sole actor or not. See Curtis, Collins & Holbrook Co. v. United States, 262 U. S. 215, 43 Sup. Ct. 570, 67 L. Ed. 956. See, also, Melton v. Pensacola Bank & Trust Co., 190 Fed. 137, 138, 111 C. C. A. 166.

The adoption of this principle would also harmonize with the "sole actor" cases, the holding in the case of Brookhouse v. Union Publishing Co., 73 N. H. 368, 62 Atl. 219, 2 L. R. A. (N. S.) 993, 111 Am. St. Rep. 623, 6 Ann. Cas. 675, which was apparently a case of "sole actor," in which the corporation was relieved from liability by reason, among others, of the fact that "the defendant was not really the principal of Moore in respect to the deposits and withdrawals of the plaintiff's money in and from its bank account; it was his agent. The transactions were solely on his account and for his benefit."

So, also, the criterion, whether the agent was acting within the scope of his agency or had stepped outside of his representative character, would constitute a more logical basis for the decision of those cases which hold that the defendant principal cannot claim the benefit of the act of the agent, such as the ownership of a negotiable instrument purchased through the agent, thus accepting the act of agency, and at the same time disclaim the imputation of notice by reason of the agency (Skud v. Tillinghast, 195 Fed. 1, 7, 115 C. C. A. 83; Ditty v. Dominion National Bank, 75 Fed. 769, 771, 22 C. C. A. 376), and is wholly consistent with those cases which do not impute to the principal the knowledge or notice of the agent where the latter is not the sole actor but only one of several, such as a member of a discount committee of a bank, and keeps silent as to his knowledge (Lilly v. Hamilton, 178 Fed. 53, 102 C. C. A. 1, 29 L. R. A. [N. S.] 558 [C. C. A. 3]; Innerarity v. Merchants' National Bank, 139 Mass. 332, 1 N. E. 282, 52 Am. Rep. 710). There such agent temporarily ceases to represent the principal, because of the fraud, and the act is to be considered as solely that of the others who are acting within the scope of their authority and who are without notice of the fraud.

[7] Whatever the true reason or "rationale" of the rule, it would seem to be too well established by the adjudicated cases to need further citation of authorities that, where the agent, for himself or for another, is dealing at arm's length with his principal, as any stranger might deal, the principal is not charged with the knowledge of the agent in respect to such transaction. This is, in our opinion, the true statement of the relationship of the parties in reference to the first two drafts under consideration. Unlike the third transaction, still to be discussed, there is no contention that, in the sale of the bonds for which such drafts were given in payment, Huntley even purported to act as agent of the bank, and, when the drafts were turned over to him, he sold them to, or had them cashed by, the bank, as any other depositor could have done. The bank, if not his vendee, was simply the instrumentality adopted by him for collecting the drafts, not he the bank's agent. In respect to the transactions covering the sale of the $85,000 draft and the $54,000 draft, therefore, we are clearly of the opinion that no notice of any equities was to be imputed to the bank, and that the case comes squarely within the holdings of the Supreme Court and of this court in the cases above cited.

[8] This brings the court to a consideration of the only remaining question, that of liability predicated upon the last sale of $10,000 par value of the Liberty Bonds themselves, by Huntley to H. & B. Beer, and the collection of the purchase price by drawing a draft for $9,202.76, in the name of the bank, to drawer's order, attaching the Liberty Bonds thereto, and procuring the face value of the draft in currency from the teller. Michel Willen, the clerk in the employ of H. & B. Beer, who handled this purchase for his employer at New Orleans, testified that "the bonds were bought from the National City Bank and paid for by draft presented to us by the Ibernia Bank & Trust Company." The method adopted by Huntley had every appearance of a sale by the bank to H. & B. Beer, and was so understood by the purchaser. The

act of Huntley, in drawing this draft and in attaching the bonds thereto and forwarding both for collection of the draft, would seem to have been clearly within the apparent scope of his authority, and, upon the well-established principles of the law of agency, his act in this connection must be considered the act of the bank. Huntley was not purporting to deal with the bank as a stranger, but purported to act, and did act, in his representative capacity, as agent, in the name of the bank.

The question is thus squarely presented whether the existence of a personal fraudulent purpose upon Huntley's part will relieve the bank from responsibility upon the theory that his knowledge cannot be imputed to the bank because of his participation in the fraud. Since the submission of this case, the Supreme Court has rendered its decision in the case of Curtis, Collins & Holbrook Co. v. United States, supra. In this case one C. H. Holbrook was a director, vice president, and manager of the appellant company, and reported to his associates that there were valuable timber lands which could be legally secured under the so-called Stone and Timber Law, and it was agreed that 30,000 acres should be thus acquired, and that Holbrook was to be paid $10 an acre therefor. By means of fraudulent entries based upon false affidavits, Holbrook procured patents to be issued and the titles to the lands in controversy to be conveyed by the patentees to a naked trustee, and by such trustee to be conveyed to the company. The validity of the company's title was thus dependent upon whether notice to Holbrook of the fraud by which the patents were secured was to be imputed to the company, or whether the company was a bona fide purchaser and relieved from this imputation of notice by reason of the personal participation of Holbrook in the fraud. The court distinguished the case of American National Bank v. Miller, supra, saying that in that case—

"the president of the Macon Bank was engaged in something in which his interest was plainly independent of any agency of his on behalf of his bank. His payment of his note was his own business, and not the bank's as his principal."

While citing several of the "sole actor" cases, and commenting upon the fact that "Holbrook was the sole agent acting for the company in securing titles to land for it," the court does not specifically adopt the "sole actor" theory, but was careful to point out that the contract was not really one of sales by Holbrook to the company, but of agency by him for the company, and then holds that the company was charged with the knowledge which Holbrook had, and, being engaged in a joint enterprise for the acquisition of the titles, could not retain its share and "repudiate the agent with all he knew."

In the peculiarity of its facts, and in its treatment, this case would seem to be of controlling force in the decision of the instant question. In both cases it is to be noted that the agent acted in his representative capacity and that his acts were within the apparent scope of the authority granted; in both cases the fraudulent interest of the agent was a commission to be earned from the consummation of the fraud; and in the case at bar the fact that Huntley had temporary custody of the negotiable securities, immediately prior to their transfer to the bank,

would not seem to transform the transaction from one of dealing for his principal to one of dealing adversely with his principal. In this particular he was in a position analogous to that of the naked trustee, Gregory, who "neither paid nor received any money and merely acted as a conduit for the titles."

It is also suggested by the decision of the Supreme Court in the case of Armstrong v. Ashley, 204 U. S. 272, 27 Sup. Ct. 270, 51 L. Ed. 482, possibly as dicta, but none the less forcibly, that the mere fact of the adverse interest of the agent, or of his personal fraud, as to a matter within the scope of his authority, will not defeat the imputation to his principal of the agent's notice as to a defect in title. Armstrong v. Ashley is not entirely satisfactory upon this point because there were other elements of notice, apart from the knowledge of the fraudulent agent. But since the decision in the Curtis, Collins & Holbrook Case, it can no longer be doubted that, while the "sole actor" doctrine does not seem to have ever received the direct and express approval of the Supreme Court, or of the federal courts of this circuit, yet such doctrine is so far approved as to charge the principal with the knowledge of the agent, where the agent is acting within the scope of his authority and for the principal, notwithstanding the personal fraud or adverse interest of the agent. If the fact that the agent is acting solely in his own interest and in the perpetration of a fraud for his sole benefit will not defeat liability in tort, where the act is done within the apparent scope of the agent's authority (Lloyd v. Grace, Smith & Co., L. R. 1912, App. Cas. 716), it is difficult to see why full responsibility for the act of the agent in matters of contract (including all that follows as a result of notice to the agent) should not be borne by the principal, wherever the act is done within the scope of the authority granted, and is an act of the agent on behalf of the principal, rather than the transaction of business with the principal.

But it is suggested, in the case of this draft, as in that of the other two, the act of Huntley on behalf of the bank was "the equivalent" of a sale of the bonds by Huntley to the bank, or at least of an advance, in the sense of a loan, to Huntley upon security of the bonds, and in either case Huntley would be dealing with the bank, and not for it; it would be his business upon which he was engaged, and not the bank's. This is but the substitution of equivalency for fact. He had merely temporary custody of the bonds, and to say that, when drawing this draft in the bank's name, he had withdrawn from his agency, or that he had theretofore sold the bonds to the bank or pledged them to the bank as collateral for a loan, and that therefore the bank was already a purchaser for value without notice, or that the bank was simply loaning its name in dealing with Huntley to assist him in collecting *his own* debt, is to imagine transactions which never took place and to substitute fiction for proof. He acted for the bank. He neither sold to it, nor borrowed from it, nor contracted with it in any way for the collection of his own debt. The first two transactions were typical sales to the bank, a dealing with it, apart from any agency. The last was an act on behalf of the bank, and liability attached, if at all, the moment the bank accepted the act of its agent by putting the draft

through for collection as the property of the bank. This beneficial interest cannot be retained, and the agency by which it was acquired repudiated.

The question is one of fact, of the capacity in which Huntley acted. Although this third transaction may have had, in part, the aspect of a sale of the bonds, or the entire beneficial interest in them, by Nolen, through Huntley, to the bank, as well as a sale of the bonds by the bank, as agent for Nolen, with notice, and in a form to mislead the New Orleans purchaser, yet, viewed as an entirety, a majority of the court are of the opinion that the matter partakes of the latter character rather than of the former, which was incidental. The fact of the predominating existence of representative capacity in Huntley, in the performance of his acts connected with this last transaction, must be found in the affirmative, just as the fact that he stepped outside of such capacity as to the earlier dealings predominates there and classifies them. This conclusion, as to the application of the legal rules to the facts regarding the third transaction, is that of a majority of the court.

[9] Although it is well recognized that in the federal courts a mere scintilla of evidence in support of the plaintiff's case is insufficient to justify its submission to the jury, it is equally well recognized that in passing upon a motion to direct, the court cannot weigh the evidence. Skud v. Tillinghast, 195 Fed. 1, 115 C. C. A. 83 (C. C. A. 6).

[10] It may well be doubted whether the evidence sufficiently shows more than a mere ground for suspicion upon Huntley's part. The numbers of the bonds were taken upon several occasions for the purpose of investigating "whether there was anything against them," and 11 days had elapsed between the first market offer and the two final sales, and apparently no defect had been disclosed in the title. Apparently, also, it was not shown that reasonable diligence would have disclosed such defect in title. Coder v. McPherson, 152 Fed. 951, 953, 82 C. C. A. 99; Williamson v. Brown, 15 N. Y. 360. There were, however, circumstances which would probably put an ordinarily prudent man upon inquiry and which would lead the ordinarily vigilant to have grave suspicions, and further, Huntley himself at least entertained such suspicions.

[11] Under these circumstances, mere suspicion of the defect in title, or even negligence in failing to make inquiry, would not charge an individual with bad faith; and this is especially so in the case of negotiable instruments, where the policy of the law is that they shall pass as currency, by delivery, and that title and possession shall be considered as one and inseparable. See Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Swift v. Smith, 102 U. S. 442, 26 L. Ed. 193; Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857; Goetz v. Bank, 119 U. S. 551, 7 Sup. Ct. 318, 30 L. Ed. 515.

[12] But in the consideration of a motion to direct a verdict it is the duty of the court to take that view of the evidence which is most favorable to the party against whom the instruction is asked (McIntyre v. Modern Woodmen of America, 200 Fed. 1, 8, 121 C. C. A. 1 [C. C. A. 6]), and, since, if viewed in this light, reasonable men might differ upon this point, the question of the extent of Huntley's knowledge is

primarily for a jury. As to this element of the case we are of the opinion that the court below erred in withdrawing it from the consideration of the jury.

The court does not deem it necessary to enter into a discussion of the much-mooted question as to whether, in the case of stolen negotiable instruments, the thief and his confederates hold the legal title to such instruments, or merely the power to convey a good title by sale to an innocent purchaser, or whether recovery in this particular could be predicated upon the claim of conversion. It is sufficient that, if Huntley was a party to the conspiracy alleged, and if the bank is not an' innocent purchaser, but is charged with the knowldege of Huntley, within the scope of his authority, and yet dealt with these bonds, the bank would be liable under the conspiracy count, whether or not it was also liable for conversion, or whether or not it was liable in equity as a holder of such securities who had disposed of them to defeat plaintiff's equity. Likewise, the bonds being negotiable instruments, a claim for conversion could be predicated alone upon notice to the bank that the bonds were stolen property, and thus the conspiracy count of the declaration would seem to afford ample ground for recovery— if such notice be proved.

[13] As an aid in retrial, it remains only to say that in our opinion the defense of bona fide purchaser is an affirmative defense, and the burden of proving it rests with the defendant. Curtis, Collins & Holbrook Co. v. United States, supra; Wright-Blodgett Co. v. United States, 236 U. S. 397, 35 Sup. Ct. 339, 59 L. Ed. 637.

The judgment of the court below must be reversed, and the cause remanded to the court for a new trial upon the issue pertaining to the one sale and draft, as above indicated.

## On Rehearing.

PER CURIAM. In the opinion it was directed that the case be remanded "for a new trial upon the issues pertaining to the one sale and draft as above indicated." In the order, entered according to the usual form, the case was remanded for a new trial. Upon the theory that the judgment was affirmed as to two of the issues and thereby became final, plaintiff is proceeding to apply to the Supreme Court for certiorari, and asks that the remanding entry be amended to comply with the opinion.

[14] We are compelled to think that the form of the opinion in this respect was inadvertent, and that the remanding entry properly expressed the only action we can take. In the court below a single verdict in favor of the defendant and against the plaintiff was returned by order of the court, and the journal entry so recites. It may be assumed that the final judgment was the only one which could be entered upon such a verdict, viz. that the defendant was not guilty and should be discharged without liability. We have no practice which permits affirming a portion of a single judgment at law, while remanding other portions for a new trial; and we do not see that this can be generally permissible when the judgment was for defendant, any more than when it was for the plaintiff.

[15, 16] Where cases separately commenced have been consolidated for trial, or where several distinct judgments in favor of separate plaintiffs are for convenience grouped in one entry in one action, the reviewing court can properly effect a severance, and affirm some and reverse others. National Surety Co. v. United States (C. C. A. 6) 228 Fed. 577, 587, 143 C. C. A. 99, L. R. A. 1917A, 336. This case does not take that aspect. We find here that all three items sought to be recovered are grouped in one count, which has as its real cause of action a conspiracy, and the three separate items considered are the items of damage alleged—all arising and claimed under one cause of action. There cannot be a final judgment granting or denying a part of the damages claimed under one count, and at the same time contemplating further proceedings in the suit to determine the liability as to the remainder of the damages claimed. This would be equivalent to splitting a single cause of action.

The opinion filed will be amended, by striking out the words "upon the issues pertaining to the one sale and draft as above indicated."